HENRY HESSE and THELMA HESSE, APPELLANTS, *v.* MARVIN KENT ASHURST, RESPONDENT.

No. 6006

April 23, 1970                                    468 P.2d 343

[Rehearing denied May 28, 1970]

*Laxalt, Bell, Berry, Allison & LeBaron,* of Carson City, for Appellants.

*Diehl, Recanzone & Evans,* of Fallon, for Respondent.

## OPINION

By the Court, MOWBRAY, J.:

Henry Hesse and his wife, Thelma Hesse, have appealed to this court from an order of the district court granting respondent Marvin Kent Ashurst's habeas petition, in which he sought and was awarded the custody of his two minor sons, Michael

Kent, aged 5, and Neal Scott, aged 4. The children and their mother, Judy, who had been severely injured in an auto accident, had been living for many months with the Hesses, Judy's parents. Judy became a paraplegic, and she died on March 31, 1969. On April 2, 1969, the First Judicial District Court issued temporary letters of guardianship to the Hesses, and the court awarded them the care, custody, and control of the minor children.[1] Thereafter, their natural father, Marvin Kent Ashurst, filed this habeas proceeding in district court, and the district judge ordered that the custody of the children be removed from the Hesses and placed with Ashurst. Hence, this appeal. We reverse, and we order that the custody of the children be returned to the Hesses pursuant to their letters of guardianship.

1. *Factual Background.*

Marvin Kent Ashurst and Judy Hesse were married on February 1, 1963. They had two sons, Michael and Neal. They had several residences in and about Carson City. In February 1967 they moved into a two-story home at 412 Thompson Street. Their marriage was not a happy one, and there were periods of separation. In May 1967 Judy met with a tragic accident and became a paraplegic. During Judy's initial hospitalization, lasting until August 1967, the Hesses cared for the children in their home in Carson City, with no financial support from respondent Ashurst. In August the family returned to their home at 412 Thompson Street and lived together until October, when Ashurst abandoned the home. Because of her condition, Judy was unable to care for the children in the two-story house; so she and the boys moved in October into the Hesses' home. They were together until December 1968, when Judy returned to the hospital, where she remained until her death. The children have lived with the Hesses until this present habeas writ was issued. Although Ashurst visited the boys on occasion after he left Judy in October 1967, his visits became

---

[1]In her will, Judy had nominated the Hesses as guardians of her sons. The will provided in part:

"I hereby nominate as the guardians of the person and estate of my sons during their minority, my father and mother, Mr. and Mrs. Henry Hesse, Carson City, Nevada, or the survivor of them, to serve without bond.

"I specifically request that my former husband, Marvin Kent Ashurst *not* be appointed guardian of my children, or either of them, and that he not be granted custody of said children or either of them, it being my knowledge and firm belief that he is an unfit person to be the guardian of said children under any circumstances." (Emphasis in original.)

less frequent and had finally ceased some time prior to Judy's death. The Hesses provided for the children and cared for them as their own.[2] Ashurst did not visit the children at Christmas time nor when Michael had an eye operation and was hospitalized.[3] Nor did Ashurst ever request custody of the children until he filed his habeas petition.[4] In July 1968, after repeated demands by Ashurst, Judy consented to a divorce. Ashurst remarried 7 days later. In the divorce proceedings Judy received custody of the children, and Ashurst agreed to pay her $50 a month for the support of each child, and no more.[5]

---

[2]"Q [by Peter D. Laxalt, attorney for appellants] During that period of time, that is from October of 1967 up to and including the present date, who has been responsible for the support, care and clothing of those children?

"A [by appellant Thelma Hesse] Hank [her husband, appellant Henry Hesse] and I.

"Q How many times did Kent [respondent Ashurst] come to visit the children once he took the job there in Hawthorne [Hawthorne, Nevada, 127 miles from Carson City]?

"A When he first went over there he came about every week. And then his visits got to be about every two weeks. And then they got so that once a month we were lucky to see him. And after March he didn't come at all.

"Q After March of 1969?

"A 1968."

[3]"Q [by Mr. Laxalt] During the period of time that Judy was still alive did Michael have an eye problem?

"A [by Mrs. Hesse] Yes, he was born with ptosis of the eye lid.

"Q Did that require surgical procedure?

"A Yes, it did.

"Q Do you know when that was performed?

"A Yes, I do, it was December 13, 1968.

"Q Was that performed in a hospital?

"A Yes, in Washoe Medical [Reno].

". . . .

"Q What period of recuperation did he have?

"A Well, he had to wear a patch over his eye for about two weeks.

"Q During that entire period of time, that is, from the moment he entered the hospital through the recuperation period, did Kent Ashurst come to see him?

"A Not to my knowledge, no."

[4]"Q [by Mr. Laxalt] During the entire period of time from May of 1967, the date of Judy's accident, up until he filed this petition in this matter, did he ever demand that you release the children to his care and custody?

"A [by Mrs. Hesse] Never did."

[5]"Q [by Mr. Laxalt] He stated to you [Robert Gaynor Berry of the Laxalt law firm] that if the child support level were over $50 a month he would disappear?

"A Yes."

## 2. *Parental Preference.*

We laid down the guide line in McGlone v. McGlone, 86 Nev. 14, 464 P.2d 27 (1970), that a fit parent is to be preferred over nonparents in child custody cases and that custody may not be given to a nonparent unless the parent is found to be unfit. We have concluded, based on the record that was received in the habeas hearing and is now before us, that the presumption of parental preference as a matter of law has been overcome in this case. Ashurst abandoned Judy and his two sons when he left her alone to care for them, which she was physically unable to do, in their two-story residence. And he did not even advise anyone that he had left her.[6] Ashurst's attitude and conduct toward his children thereafter was one of callous indifference and abandonment. Until after Judy's death, he was perfectly content that his sons' care and custody remain with the Hesses. He excuses his indifference on the ground that he did not feel welcome in the presence of the Hesses. Yet the record fails to support his explanation.[7] Rather, the record indicates that Ashurst was content to go it alone, as far as his family was concerned. He went out with other women.[8] He

---

[6]"Q  Who did you telephone—when you left her in that house a paraplegic in a wheelchair with the children, who did you telephone to say that you were leaving?
"A  I don't remember.
"Q  You didn't telephone a soul, did you?
"A  I don't remember whether I did or not."

[7]"Q  [by Mr. Laxalt]  Did Mr. Hesse ever even raise his voice to you?
"A  [by respondent]  No, he did not.
"Q  Did Mrs. Hesse?
"A  No, she did not.
"Q  What did they ever do to you to indicate that you weren't welcome in that house to see Judy and those children?
"A  Do they have to do anything, can't you just take a feeling?
"Q  "What did they do?
"A  Nothing specifically, I just got a general feeling."

[8]"Q  [by Mr. Laxalt]  How many women did you go with between the time of the accident and the time of the divorce, Kent?
"A  [by respondent]  What do you mean 'go with'?
"Q  How many women were you going out with during the time that you were married, one, two, three, four, five?
"A  Nobody steadily. Occasionally I had female companionship, yes.
"Q  But without the knowledge of your wife?
"A  That is true."

infected Judy with gonorrhea.[9] He cashed bad checks.[10] Placed alongside these qualifications of parental fitness, we have the candid statement of counsel for respondent that the Hesses are well able to care for the two young boys:

Mr. Diehl: "We would suggest to the court at this time that at no time during the course of these proceedings did we question the fitness of the maternal grandparents as far as caring for these children. I think they proved themselves to be devoted as far as parents to their own children were concerned and of course indeed devoted as far as their grandchildren are concerned."

The record supports counsel's forthright admission regarding the fitness qualifications of the Hesses. They are comparatively young grandparents, in their late 40's, and they are well qualified to provide for the care and custody of the two children.

We conclude that the presumption of parental preference in this case has been overcome. The record presents conclusive

---

[9] "Q [by Mr. Laxalt]  How many times have you had a venereal disease, Kent?

"A  [by respondent]  Once.

"Q  Gonorrhea?

"A  Yes.

"Q  When was it?

"A  It was in '67, early part of '67.

"Q  You infected your wife with it, didn't you?

"A  Well, I don't know whether I did or not.

"Q  Well, you know as a matter of fact that she went to Reno to be treated by Dr. Wolf, don't you?

"A  Yes, I do.

"Q  Then you know she was infected, don't you?

"A  I will state yes, that she was infected.

"Q  Where did you pick up this disease, if you know?

"A  I don't know.

"Q  You told her you picked it up from a toilet seat?

"A  Yes.

"Q  In January or February of 1968 did you have yourself sterilized?

"A  Yes, I did."

[10] "Q  [by Mr. Laxalt]  As a matter of fact, you have cashed bad checks at casinos throughout western Nevada for gambling, haven't you?

"A  [by respondent]  Yes, I have.

"Q  On at least five occasions?

"A  I don't roughly know the count but that could be close.

"Q  It got to the point where your wife took you off the bank account, is that correct?

"A  I think in that case I asked myself to have her take me off the bank account, in fact I volunteered."

evidence of respondent's unfitness. In the final consideration, the best interests of the children remain paramount. NRS 125.140; Cooley v. Cooley, 86 Nev. 220, 467 P.2d 103 (1970); Peavey v. Peavey, 85 Nev. 571, 460 P.2d 110 (1969); Timney v. Timney, 76 Nev. 230, 351 P.2d 611 (1960). We believe that those interests will best be served in this case by placing the care and custody of the two children with the Hesses. We therefore reverse the order of the district court granting habeas, and we remand the case to the district court with instructions to enter an appropriate order directing the respondent to deliver the children to the appellants, pursuant to their letters of guardianship.

COLLINS, C. J., ZENOFF, BATJER, and THOMPSON, JJ., concur.