2002-NMCA-103

55 P.3d 984

In the Matter of GUARDIANSHIP OF ASHLEIGH R. and Stefanee R., Minor Children,

Judith Thomas–Lott and Paul Lott, Petitioners–Appellees,

v.

Michelle Earles, Respondent–Appellant.

No. 22,647.

Court of Appeals of New Mexico.

Aug. 6, 2002.

Certiorari Denied, No. 27,676, Oct. 8, 2002.

Judith Thomas–Lott, Paul Lott, Santa Clara, NM, Pro Se Appellees.

Robert F. Turner Deming, NM, for Appellant.

## OPINION

PICKARD, Judge.

{1} Mother appeals from a judgment appointing guardians for her two daughters. Mother argues that the trial court had no authority under the Probate Code to appoint guardians for the children when Mother retained the right to custody and objected to the appointment. Mother also argues that the trial court should have applied the parental rights doctrine and granted Mother custody of her daughters in the absence of an express finding that she was an unfit parent. Mother asks this Court to remand for a hearing to determine if she is currently fit to have custody. Because we agree that the trial court had no authority to appoint guardians for the girls, and could not deny Mother custody without an express finding that she was unfit or that other extraordinary circumstances existed, we reverse and remand.

## FACTS

{2} Mother and Father had two children, Ashleigh and Stefanee, during the course of their marriage. When the couple began to experience marital difficulties in the winter of 1997–98, the girls went to live with their maternal grandmother (Grandmother) in Santa Clara, New Mexico. The marriage ended in part due to incidents of domestic violence. As the couple's divorce was pending, Mother also moved in with Grandmother and the two girls. For the next two years, Mother moved in and out of the house, sometimes taking the girls with her, but usually leaving them in the care of Grandmother. Despite minor factual disputes, the parties essentially agree to the following timeline. In the spring and early summer of 1998, Mother moved the girls to two different towns in the Silver City area, then sent the girls to live with Grandmother again. In June, both Mother and Father signed a document granting Grandmother temporary custody. Around the same time, Mother was granted legal custody in the divorce. In July, Mother again moved into the Santa Clara house with Grandmother and the children, and stayed there until April 1999, when she moved to Levelland, Texas, with her boyfriend, Buddy. The girls joined the couple in Texas at the end of the school year. When Buddy was laid off at the end of the summer, Mother moved the girls back to Grandmother's house, and the girls again enrolled in school in Santa Clara. Mother then joined Buddy in Farmington, where he sought work in the oil and gas industry. Mother moved back in with Grandmother in November, and stayed until January, when she got her own apartment in Santa Clara. In February, Mother married Buddy, and at the end of March she returned to Farmington. About two weeks later, Mother and Buddy had moved to Tucson, Arizona, leaving the girls with Grandmother.

{3} Grandmother married Paul Lott in March 2000. In May, the couple jointly filed a petition for guardianship of the two girls. Although Paul Lott is not the biological grandparent of the children, for simplicity we will refer to Petitioners as "Grandparents." Although the parties dispute the specific course of events, all acknowledge that Mother began asking Grandmother to return the girls to her custody sometime in the late spring or early summer of 2000. Mother testified that she contacted the Human Services Department and asked how she could regain custody. Grandmother testified that Mother sent two letters in June asking that the children be returned to her. In July 2000, Mother arrived at Grandmother's house with a police escort. The police refused to help Mother regain custody at that time, however, because Mother had arrived after midnight. Grandmother telephoned a social worker, who advised the officers that it would harm the children to allow Mother to take them away in the middle of the night. Mother did not file a petition for habeas corpus, but responded to Grandmother's petition for guardianship, indicating that she objected to the guardianship and wanted custody returned to her. Father also responded, acknowledging that he was not in a position to take custody of the girls, but indicating that he did not want his parental rights terminated.

{4} Grandparents initially sought to modify the award of custody to Mother within the divorce decree, then amended their petition to seek guardianship under the Probate Code, NMSA 1978, § 45–5–204(A) (1995). That statute authorizes the appointment of guardians for children whose parents are deceased or whose parental rights have been terminated or suspended by court order, or have been "suspended by circumstances." *Id.* Grandparents also sought a restraining order allowing them to maintain custody while the proceedings were pending and allowing Mother only supervised visitation. The trial court granted the restraining order in August 2000. The court held a hearing on the petition in December 2000, but was unable to take all testimony and continued the matter until June 2001. In the meantime, Mother was allowed unsupervised visitation. The girls visited Mother in Tucson during Christmas. Mother was subsequently involved in a car accident in which she injured her wrist and her car sustained significant damage. As a result, Mother did not visit the girls in Santa Clara during the following months. Mother's attorney scheduled a bonding study, but Grandparents failed to bring the girls to Tucson at the scheduled time. The court then completed its evidentiary hearing in June, asking the parties to submit requested findings of fact and conclusions of law and to submit the report from the bonding study when it was completed. The record does not show that a bonding study was ever done or that a report was ever filed. The trial court entered an order naming Grandparents as guardians in June 2001. Mother then brought this appeal. Father did not appeal the judgment.

## DISCUSSION

### 1. The District Court Erred in Appointing Guardians Under the Probate Code

■ {5} The issue on appeal is whether the trial court had the statutory authority to name Grandparents as guardians despite Mother's objections. The Probate Code authorizes court appointment of guardians for children "if all parental rights of custody have been terminated or suspended by circumstances or prior court order." Section 45–5–204(A). The trial court found that both parents' right to custody had been "suspended by circumstance[s]." We have construed· this specific language in two prior cases. *See In re Guardianship of Sabrina Mae D.*, 114 N.M. 133, 139, 835 P.2d 849, 855 (Ct.App. 1992); *In re Guardianship Petition of Lupe C.*, 112 N.M. 116, 120, 812 P.2d 365, 369 (Ct.App.1991). *Lupe C.* also involved an intrafamily custody dispute. In that case the district court also found that the mother's rights had been "suspended by circumstances" because the mother was unable to provide a fit and suitable home or the necessary emotional support and guidance. *Id.* at 118, 812 P.2d at 367. We reversed the judgment and returned custody to the mother. *Id.* at 122, 812 P.2d at 371. We explained that courts have limited authority to appoint a guardian for a minor under the Probate Code. *Id.* at 119–20, 812 P.2d at 368–69. We held that a parent's custodial rights have been "suspended by circumstances" only when (1) the parent consents to the appointment of a guardian or (2) the parent's whereabouts are unknown. *Id.* at 120, 812 P.2d at 369. Because the mother in *Lupe C.* objected to the proceedings and her whereabouts were known, we held that the district court had no authority under the Probate Code to appoint a guardian. *Id.*

{6} In *Sabrina Mae D.*, the grandparents filed a petition seeking guardianship of a child after the mother had voluntarily sent the child to live with the grandparents, but then changed her mind and took the child back to California with her. *See Sabrina Mae D.*, 114 N.M. at 135, 835 P.2d at 851. Again, the mother objected. *See id.* We held that the grandparents could not seek guardianship under the Probate Code, explaining that a guardianship proceeding is not the proper means to involuntarily terminate a parent's right to custody of his or her children. *Id.* at 114 N.M. at 139, 835 P.2d at 855.

{7} Grandparents argue that the holdings of *Lupe C.* and *Sabrina Mae D.* apply only when a child is in the parent's physical custody at the time the proceedings begin. Because they were caring for the two girls at the time they filed their petition, Grandpar-

ents argue that they should be able to seek guardianship under the Probate Code. In support of this argument, Grandparents cite language from *Lupe C.* indicating that the Probate Code cannot be used to remove custody from a parent "where the parent in fact is invested with *and is currently exercising custody of the child.*" *Lupe C.*, 112 N.M. at 122, 812 P.2d at 371 (emphasis added). They argue that the district court does have authority to find that a parent's custodial rights have been "suspended by circumstances" when a parent voluntarily relinquishes custody of the child.

{8} We cannot agree with Grandparents' interpretation of *Lupe C.* In reaching our holding in that case, we explained that the Probate Code was not designed to resolve custody disputes. *Id.* at 120, 812 P.2d at 369. We cited language from the drafting committee's comment to Uniform Probate Code, § 5–204 (1983), indicating that "[t]he court . . . is not authorized to appoint a guardian for one for whom a parent has custodial rights or for one who has a parental guardian." *Id.* at 120, 812 P.2d at 369 (internal quotation marks omitted). We also cited language from a commentator explaining that "the court has no power to appoint a guardian at all if the minor has a living parent entitled to his custody." *Id.* (emphasis, internal citation, and quotation marks omitted). In addition, we explained that the Probate Code cannot be used to circumvent the Children's Code, which establishes proceedings to deal with abused and neglected children. *Id.* at 120–22, 812 P.2d at 369–71; *see also In re Guardianship of Mikrut,* 175 Ariz. 544, 858 P.2d 689, 692 (App.1993) ("Parental rights cannot be suspended indefinitely without either the consent of the parent or court-ordered termination or suspension following [ ] procedural safeguards. . . ."). We stated in *Sabrina Mae D.* that "since Petitioner contested Grandparents' appointment as guardians of the child in the present case, her right to custody could not be deemed to have been 'suspended by circumstances' within the contemplation of Section 45–5–204(A)." *Sabrina Mae D.*, 114 N.M. at 139, 835 P.2d at 855. The same rule applies in this case.

{9} We expressed concern in *Lupe C.* that guardianships created under the Probate Code could be unlimited in time and would not be subject to periodic review. *Lupe C.*, 112 N.M. at 122, 812 P.2d at 371. The same concern applies regardless of whether a parent has physical custody at the time a petition is filed, and this case demonstrates the problems that can arise. In entering its judgment of guardianship, the district court did not specify whether the guardianship was temporary or permanent and did not indicate whether or how it would be possible for Mother to regain custody. In contrast, when a child is adjudged neglected under the Children's Code, the Code requires the department to provide services and to undertake efforts to attempt in the reunification of the family and further requires periodic review of the situation. *See* NMSA 1978, §§ 32A–4–22(C) & –25 (1999). In this case, although Mother has never been found to have neglected her children, no one is assisting her in efforts to reunify with her family or to become a better parent. Grandparents argue that Mother can petition to have her custody rights restored at a later date. It is not clear, however, how Mother could ever achieve that goal if the district court could continue to apply a simple, comparative standard as between potential custodians, because as the children spend more and more time living with Grandparents, the likelihood that it will be in their interest to remain in a familiar environment increases.

{10} In *Lupe C.*, we included only two specific situations within the definition of "suspended by circumstances," and neither situation is present here. Mother has not consented to the appointment of a guardian, and Mother's whereabouts have been known throughout the proceedings. Grandparents argue that Mother's whereabouts were unknown at the time the petition was first filed. This fact, however, does not establish that Mother's whereabouts remain "unknown" for purposes of the Probate Code. Grandparents acknowledge that they were unaware of Mother's whereabouts for only a short time. They knew Mother had moved up to Farmington in March, they knew sometime thereafter that she had moved to Tucson and that Mother sent the girls Easter baskets in

April, and they knew of her actual address by June. More importantly, Mother has been present at each hearing and has been visiting with the girls throughout the proceedings. Parents' whereabouts will be considered unknown only when they cannot be located throughout the guardianship proceedings. *See In re Guardianship of Copenhaver,* 124 Idaho 888, 865 P.2d 979, 984–85 (1993) (holding that the rights of a mother who initially consented to a guardianship were not suspended by circumstances when she revoked her consent, and expressed willingness to care for the children, and her whereabouts were known).

{11} Grandparents also argue the district court had the authority to modify the agreement granting them temporary custody, and could find that the parents "consented" on that basis. The parents granted only temporary custody to Grandparents. Implicit in that agreement is the right to revoke it at any time. Neither parent consented to the appointment of guardians for their children. The district court could not modify a prior agreement to create consent that was clearly lacking. *See Greene v. French,* 97 N.M. 493, 494–96, 641 P.2d 524, 525–27 (Ct.App.1982) (holding that a mother's agreement to sign temporary guardianship papers did not constitute consent to permanent guardianship); *see also Harbin v. Sandlin,* 243 Ga. 677, 256 S.E.2d 360, 361 (1979) (holding that parents did not relinquish their rights permanently by granting of temporary custody to a third party); *Painter v. Bannister,* 258 Iowa 1390, 140 N.W.2d 152, 156 (1966) (holding that a father who placed children temporarily with their grandparents did not permanently relinquish his parental rights).

▪ {12} Grandparents finally argue that this issue was not preserved below. Mother's attorney never cited to either *Lupe C.* or *Sabrina Mae D.,* and never specifically argued that the district court had no authority under the Probate Code to appoint guardians for the girls. It would have been preferable if Mother had cited these specific authorities. Had she done so, the district court might have applied the correct standard below, and the parties might have avoided the need for this appeal. However, Mother's requested

findings of fact included assertions that she had never abused or neglected the girls, that she was a fit parent, and that her parental rights had not been terminated. On that basis, she requested that the trial court return custody of the children to her. These requested findings of fact and conclusions of law were sufficient to alert the trial court to the appropriate standards to apply when deciding whether or not a parent should have custody of her children or whether a guardian should be appointed over a parent's objection. *See Quintana v. Baca,* 1999–NMCA–017, ¶ 12, 126 N.M. 679, 974 P.2d 173 (holding that advising district court of general theory is sufficient to preserve issue for appeal). We therefore dispose of this issue on the merits. Because Mother contested the appointment of Grandparents as guardians, the district court erred in finding that her right to custody was "suspended by circumstances" and erred in appointing Grandparents as guardians on those grounds.

## 2. The District Court Erred in Denying Mother Custody

▪ {13} The denial of Grandparents' petition for guardianship, however, does not necessarily mandate a return of custody to Mother. The appointment of guardians and determination of custody are two separate matters. "[T]he court may award or continue custody in third parties without issuing letters of guardianship." *Sabrina Mae D.,* 114 N.M. at 139, 835 P.2d at 855. Legal custody is a status created by court order and vests in a person the right to determine where and with whom a child will live. *Brito v. Brito,* 110 N.M. 276, 279, 794 P.2d 1205, 1208 (Ct.App.1990). In this case, Grandparents initially sought to modify the custody determination made during the parents' divorce, but then amended their petition and included only a petition for guardianship under the Probate Code. The focus of the hearings, however, was which of the parties would be the better custodian for the children. The district court found that it would be in the best interest of the children to remain with Grandparents. Thus, we must decide whether we can affirm the district court's award of custody to Grandparents, even though we cannot affirm the district

court's decision to name Grandparents as guardians. *See Romero v. Prince,* 85 N.M. 474, 476, 513 P.2d 717, 719 (Ct.App.1973) (allowing an appellate court to affirm if the trial court has reached the right result for the wrong reason).

{14} Mother argues that the district court should have applied the parental preference doctrine rather than applying the comparative best interest of the child standard. New Mexico has long recognized the parental preference doctrine, which holds that in a custody contest between a parent and a nonparent, the parent should generally prevail unless he or she is found unfit. *Shorty v. Scott,* 87 N.M. 490, 493, 535 P.2d 1341, 1344 (1975). The rule creates a presumption that the interests of minor children will best be served in the custody of the natural parents, and casts the burden of proving the contrary on the nonparent. *Id.* Thus, the trial court must ordinarily make an express finding that the parent is unfit before denying the parent custody. *Id.* at 494, 535 P.2d at 1345.

{15} Our Supreme Court has acknowledged and expounded upon an additional exception to the general rule that parents are entitled to custody of their children. *See In re Adoption of J.J.B.,* 119 N.M. 638, 652, 894 P.2d 994, 1008 (1995). A parent who is an otherwise fit custodian can be denied custody based on a finding that "extraordinary circumstances" justify such a decision. *Id.* In *J.J.B.,* the Court recognized the difficulties involved for children who are removed from stable, loving homes and separated from people who have acted as psychological parents. After a prolonged separation, "[i]t is conceivable that the biological parent, though not unfit and not responsible for the disintegration of the parent-child relationship, may still be incapable of reestablishing the necessary parental bond with the child." 119 N.M. at 654, 894 P.2d at 1010. While *J.J.B.* involved adoption proceedings, as will be discussed below, a number of other states have applied the extraordinary circumstances standard in custody disputes between parents and nonparents. Our legislature incorporated "extraordinary circumstances" as a basis to appoint a guardian for a child under the Kinship Guardianship Act, NMSA 1978, § 40–10B–8(B) (2001). That statute was not in place at the time Grandparents initiated these proceedings. Nonetheless, we think the legislative recognition of the applicability of that standard in guardianship proceedings justifies its application in custody actions, which involves a somewhat lesser infringement on parental rights.

{16} Upon a finding of parental unfitness or extraordinary circumstances, the district court can then determine what custody arrangement would be in the comparative best interest of the child. *J.J.B.,* 119 N.M. at 654, 894 P.2d at 1010. Absent such findings, however, the comparative best interest of the child standard does not apply in proceedings between parents and nonparents. The comparative best interest of the child standard "essentially compares the merit of the prospective custodians, and awards custody to the better of the two." *In re Marriage of Allen,* 28 Wash.App. 637, 626 P.2d 16, 21 (1981). If only a showing of the comparative best interest of the child were required,

> a child might be taken away from the natural parent and given to a third party simply by showing that a third party could provide the better things in life for the child and therefore the 'best interest' of the child would be satisfied by being placed with a third party.

*Hendrickson v. Binkley,* 161 Ind.App. 388, 316 N.E.2d 376, 381 (1974).

{17} The district court in this case applied the comparative best interest of the child standard without an express finding that Mother was unfit or that there were extraordinary circumstances justifying the application of that standard. This in itself was error. In addition, based on our review of the record, we do not think there was sufficient evidence to support either finding.

*Mother Was Not Unfit to Care for Her Children*

{18} Grandparents assert that there was sufficient evidence to support a finding that Mother is unfit—that she abused the girls, abandoned them, and neglected them. However, the trial court made no

such findings, even though Grandparents requested those findings. When a trial court rejects proposed findings of fact, we assume that there was insufficient evidence to support them. *See Landskroner v. McClure,* 107 N.M. 773, 775, 765 P.2d 189, 191 (1988).

{19} In addition, we agree with Mother that Grandparents did not present sufficient evidence that Mother is unfit. A parent is unfit when he or she is unable to care for the child. *See Greene,* 97 N.M. at 495–96, 641 P.2d at 526–27. A parent's unfitness can be shown through evidence "demonstrating parental inadequacy or conduct detrimental to the child," including but not limited to abuse, neglect, or abandonment. *State ex rel. Children, Youth & Families Dep't v. Joe R.,* 1997–NMSC–038, ¶ 12, 123 N.M. 711, 945 P.2d 76 (internal citation and quotation marks omitted). A finding of unfitness must be based on current evidence, not on prior acts alone. *See Greene,* 97 N.M. at 495, 641 P.2d at 526.

{20} Mother was not found to have neglected her children. The New Mexico Legislature has defined a neglected child as one

> who is without proper parental care and control or subsistence, education, medical or other care or control necessary for the child's well-being because of the faults or habits of the child's parent, guardian or custodian or the failure or refusal of the parent, guardian or custodian, when able to do so, to provide them.

*See* NMSA 1978, § 32A–4–2(E)(2) (1999). Evidence that a parent left a child in the care of others is not necessarily sufficient to establish neglect, as long as the parent continues to insure that the caretaker is properly providing for the children's needs. *See In re Termination of Parental Rights of Eventyr J.,* 120 N.M. 463, 468–69, 902 P.2d 1066, 1071–72 (Ct.App.1995) (holding mother responsible for harm that befell children while in the care of others, where mother repeatedly left children with others when she "needed a break," sometimes did not know where children were, and left children in the care of their grandmother knowing that the grandmother was ill and that it was difficult for the grandmother to take care of the children). A

contrary rule would have the unfortunate effect of discouraging parents from seeking assistance when they find themselves unable to fully discharge the responsibilities of parenthood.

{21} The trial court did find that there had been incidents of domestic violence in Mother's home. Evidence of past domestic violence can be relevant in an action for neglect when the abused parent fails to recognize the harm the violence causes the children or refuses to get help in ending the situation. *See State ex rel. Children, Youth & Families Dep't v. Tammy S.,* 1999–NMCA–009, ¶¶ 17–18, 126 N.M. 664, 974 P.2d 158; *Eventyr J.,* 120 N.M. at 469, 902 P.2d at 1071. The trial court did not find, however, that the incidents of abuse in this case constituted neglect. The incidents of domestic violence described at the hearing occurred while Mother and Father were married and still living together. These incidents, however, occurred at least four years prior to the hearing, while Mother and Father were still living together. In addition, there was no evidence that the children witnessed these incidents. There was also testimony that Mother and Buddy experienced "domestic problems" prior to their marriage and that Mother spent a week at a women's shelter. However, there was no evidence of continuing abuse in that relationship. Thus, the district court's finding that some incidents of domestic violence have occurred in Mother's home does not support a finding that Mother has been neglectful of her children.

{22} Nor was Mother found to have abandoned her children. The two-part test for abandonment requires (1) proof of parental conduct that implies a conscious disregard of parental obligation and (2) evidence that the parent-child relationship was destroyed by the parental conduct. *See State ex rel. Children, Youth & Families Dep't v. Joe R,* 1996–NMCA–091, ¶ 5, 122 N.M. 284, 923 P.2d 1169, *rev'd on other grounds,* 1997–NMSC–038, 123 N.M. 711, 945 P.2d 76. "The typical kinds of conduct which constitute abandonment are the withholding of parental presence, love, care, filial affection and support and maintenance." *In re Adoption of*

*Doe,* 89 N.M. 606, 619, 555 P.2d 906, 919 (Ct.App.1976). Again, not every placement with a nonparent constitutes abandonment. *See id.* A parent's contact with the children and financial support for the children during their absence will weigh against a finding of abandonment. *Id.* Here, Mother contributed very little financially while the girls lived with Grandparents. However, Mother asked Grandparents to help her in part because she was struggling financially after her divorce from her first husband. Grandparents presented witnesses who testified that Mother failed to show affection to the girls and that Mother failed to care for the girls even when she was living with them. This is not a case, however, where the parent left children in the care of another and then disappeared from their lives. Mother would leave for two to three months at a time, and even when she was present, she was not acting in a maternal role. Nonetheless, because Mother remained in contact with the children and was not a stranger to them, the district court was justified in implicitly finding that she did not abandon her children.

{23} Nor did the district court find that Mother is unfit to raise her daughters. In many cases where a parent has not had custody for an extended period of time, it is difficult to evaluate the parent's current fitness. In this case, however, Mother was raising another child while this matter was proceeding. Mother presented witnesses who testified that she is acting as a capable caregiver for her son. Grandparents attempted to rebut this evidence with testimony that, when Mother lived with them, she failed to keep the son's room clean, failed to change his diaper often enough, and left. her son to sleep in a cold room while she slept in front of the fireplace. None of these witnesses, however, could comment on Mother's current situation since she moved to Tucson, and the testimony of these witnesses could not rebut the testimony of witnesses who had observed Mother with her son in that environment. In addition, this anecdotal evidence is insufficient to support a finding that Mother was neglectful toward her son. Even if this evidence established some level of neglect, we doubt that these incidents, if reported to CYFD, would be sufficient to justify removal of the son from Mother's care, rather than some less intrusive means of intervention, such as parenting classes and home visits. *See* NMSA 1978, § 32A–4–18(C) (1999) (mandating that custody of a child alleged to be neglected be returned to a parent's care unless there is evidence that the child is suffering from an illness or injury, is in immediate danger from his surroundings, will be subject to injury by others, or is not being provided with adequate supervision or care). Nor was any evidence presented that Mother favored the son and abused or neglected the daughters. We hold that Grandparents presented insufficient evidence to prove that Mother was unfit to care for her children at the time of the hearing.

*There Were No Extraordinary Circumstances to Justify Denying Mother Custody*

{24} Although the district court did not expressly apply the extraordinary circumstances doctrine, Grandparents argued throughout the proceedings that the children would suffer harm if removed from Grandparents' home after living there for three years. A lengthy separation between parent and child can be an exceptional circumstance justifying the denial of custody to an otherwise fit parent. "[T]he child may be so long in the custody of the nonparent that, even though there has been no abandonment or persisting neglect by the parent, the psychological trauma of removal is grave enough to threaten destruction of the child." *Bennett v. Jeffreys,* 40 N.Y.2d 543, 387 N.Y.S.2d 821, 356 N.E.2d 277, 284 (1976).

{25} Even when applying the extraordinary circumstances test, only "grave reasons" approaching, but not necessarily reaching, those required for termination of parental rights should overcome the presumption that children are better raised by their own parents. *In re Welfare of P.L.C.,* 384 N.W.2d 222, 225 (Minn.Ct.App.1986). A finding of extraordinary circumstances must be based on proof of a substantial likelihood of serious physical or psychological harm, *see Watkins v. Nelson,* 163 N.J. 235, 748 A.2d 558, 564 (2000), or "serious detriment to the child," *Locklin v. Duka,* 112 Nev. 1489, 929 P.2d 930, 934 (1996).

{26} A few courts, in cases where a parent has voluntarily relinquished custody, shift the burden of proof to that parent to prove that he or she is fit and that there will be no psychological damage to the child if the parent regains custody. *See, e.g., C.G. v. C.G.,* 594 So.2d 147, 149 (Ala.Civ.App.1991) ("[A]fter a voluntary forfeiture of custody, or a prior decree removing custody, including temporary custody, from the natural parent and awarding it to a nonparent, [the parental preference] presumption does not apply."); *Overfield v. Collins,* 199 W.Va. 27, 483 S.E.2d 27, 34 (1996). In the majority of states, however, the nonparent still bears the burden of proving that exceptional circumstances exist. *See, e.g., Ross v. Hoffman,* 280 Md. 172, 372 A.2d 582, 591–92 (1977); *Michael G.B. v. Angela L.B.,* 219 A.D.2d 289, 642 N.Y.S.2d 452, 454 (1996). A number of courts recognize that a parent may be acting in the child's best interest by temporarily leaving the child with a more stable caregiver.

> [P]arents should be encouraged in time of need to look for help in caring for their children without risking loss of custody. The presumption preferring parental custody is not overcome by a mere showing that such assistance was obtained. Nor is it overcome by showing that those who provided the assistance love the children and would provide them with a good home. These circumstances are not alone sufficient to overcome the preference for parental custody.

*In re Interest of Rohde,* 503 N.W.2d 881, 883 (Iowa Ct.App.1993) (internal citation and quotation marks omitted), *overruled on other grounds by In re Guardianship & Conservatorship of D.D.H.,* 538 N.W.2d 881, 883 (Iowa Ct.App.1995). Others recognize that unstable or inadequate parents can turn their lives around and become suitable custodians for their children. *See, e.g., Eaton v. Eaton,* 50 Ill.App.3d 306, 8 Ill.Dec. 409, 365 N.E.2d 647, 651 (1977) (granting custody to a mother who had been unable to take custody due to emotional problems, but had subsequently overcome those problems); *Doles v. Doles,* 848 S.W.2d 656, 661 (Tenn.Ct.App.1992) (granting custody to mother even though she "previously was not a proper custodial parent").

"The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State." *Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). Similarly, a parent's fundamental rights do not evaporate when, rather than waiting for the state to step in, a parent seeks help with child rearing from a family member.

{27} Nonetheless, a reformed parent's right to regain custody is to be balanced against the child's need for stability and attachment to the third-party caregiver. *See Worden v. Worden,* 434 N.W.2d 341, 342–43 (N.D.1989) ("[E]ach case in which such a placement has been upheld by this court has involved a child who has been in the actual physical custody of the third party for a sufficient period of time to develop a psychological parent relationship with that third party."). Among the factors to be considered are (1) the length of time the child has been away from the biological parent, (2) the age of the child when care was assumed by the third party, (3) the possible emotional effect on the child of a change of custody, (4) the period of time which elapsed before the parent sought to reclaim the child, (5) the nature and strength of the ties between the child and the third party custodian, (6) the intensity and genuineness of the parent's desire to have the child, and (7) the stability and certainty as to the child's future in the custody of the parent. *Ross,* 372 A.2d at 593.

{28} Most courts have applied the extraordinary circumstances doctrine when a parent has been separated from the child for several years with very little contact. For example, courts in Maryland and New York denied custody to parents who had allowed third parties to raise their children from birth and had been absent for several years, with little contact, before seeking to regain custody. *See Ross,* 372 A.2d at 592–95; *Bennett,* 387 N.Y.S.2d 821, 356 N.E.2d at 280. A Nevada court, on the other hand, granted custody to a mother even though her daughter had lived with her grandparents for nine years. *Locklin,* 929 P.2d at 934–35. The court pointed

out that the mother had finally straightened her life out after struggling with drug addiction, and that the mother had maintained contact with her daughter while recognizing her inability to care for her. *Id.* The court urged the grandparents to support reunification rather than putting the child in the middle of an intrafamily dispute. *Id.* at 936 n. 1. Similarly, a Wisconsin court granted custody to a mother who had left her child in the care of family members for eight years, but who had been in contact with the child throughout that time. *See Barstad v. Frazier,* 118 Wis.2d 549, 348 N.W.2d 479, 489–90 (1984).

{29} A number of courts have described three years as a benchmark for determining whether the separation is long enough to justify a finding of extraordinary circumstances. *See Stockwell v. Stockwell,* 116 Idaho 297, 775 P.2d 611, 613–14 (1989) ("[W]here an adverse party has custody of the child for an appreciable period of time (in excess of three years), the best interests of the child dictate custody being placed with the adverse party if the facts show [that party] is better fitted to raise the child than the natural parent."); *In re Cole,* 265 So.2d 835, 837–39 (La.Ct.App.1972) (affirming denial of custody to parent after three years of separation); *Powers v. Hadden,* 30 Md.App. 577, 353 A.2d 641, 646 (1976) ("There is little support for the proposition that a three-year separation is so exceptional a circumstance as to abrogate the parental custody presumption."); *Ford v. Ford,* 172 W.Va. 25, 303 S.E.2d 253, 255 (1983) (affirming grant of custody to parent after almost three-year separation). A New York court, however, denied custody to a mother who intended to permanently relinquish custody to her ex-husband, but changed her mind after one year. *See Michael G.B.,* 642 N.Y.S.2d at 454. However, in that case there were other compelling circumstances. *See id.* at 456.

{30} In this case, Mother left the two girls in Grandparents' care for more than two years before Grandparents filed their petition. However, Mother maintained contact with the girls, lived with them in the Santa Clara house for more than half that time, moved out of the house four months before Grandparents filed their petition, and moved out of the area only two months earlier. At that point, although the children looked to Grandparents as parental figures, and Mother had demonstrated failings in her ability to display maternal affection toward the children, the children were not strangers to Mother. In addition, Mother asked that the children be returned to her custody within in a few months after leaving the Santa Clara house. At the latest, Mother asked that the children be returned to her in June, six months after she left the Santa Clara house. By the time the district court held its final hearing, the children had lived with Grandparents for more than three years and had clearly grown attached to Grandparents. However, they also maintained contact with Mother during that time. We cannot say that the separation was so long that Mother has forfeited her fundamental right to the care and custody of her children.

{31} Grandparents also testified that the girls did not want to live with Mother and experienced nightmares and other signs of emotional stress when they visited her. As discussed above, in some cases the parental preference will be overcome when children have grown so attached to their caregivers that there is a substantial likelihood that psychological harm will result from a change in custody. However, the psychological harm from the transfer of custody cannot be presumed, but must be proven by those who seek to deny custody to the parent on that basis. Commentators warn against overemphasizing the potential psychological harm. They note that any transition is likely to cause some stress, but that does not mean the child will suffer long-term psychological damage. *See* David E. Arredondo, & Leonard P. Edwards, *Attachment, Bonding, and Reciprocal Connectedness: Limitations of Attachment Theory in the Juvenile and Family Court,* 2 J. of the Ctr. for Fams., Child. & Cts. 109, 120 (2000) (differentiating permanent psychological damage from emotional harm that will be relatively short-term in duration). Grandparents' testimony established that the children were apprehensive about a potential change in custody. It did not, however, establish that this appre-

hension could not be overcome by proper assurances from both parties. Thus, their evidence was insufficient to establish that the girls would suffer substantial, long-term psychological harm if custody was transferred to Mother.

{32} Because Mother maintained contact with the children while leaving them in the care of Grandparents and sought to regain custody shortly after leaving them with Grandparents in the spring of 2000, and because Grandparents presented insufficient evidence that the girls would suffer psychological damage if returned to Mother's custody, we hold that Mother's voluntary relinquishment of custody and the girls' subsequent attachment to Grandparents does not create extraordinary circumstances that would justify an application of the comparative best interest standard rather than the parental preference doctrine.

*Grandparents May Present Current Evidence of Unfitness or Extraordinary Circumstances on Remand*

{33} The Grandparent's central argument, however, was that Mother could not provide a stable home environment for the girls. This is another way of saying that Mother is unfit. The trial court found that "[u]p until the last six (6) to eight (8) months, [Mother's] life style has been erratic." Mother acknowledged that she had at least seven different residences between January 1998 and May 2000. The court, however, did not find that Mother was continuing to live an erratic lifestyle. By the time the court held its final evidentiary hearing in this matter, Mother and her husband had lived in Tucson for more than a year, although they had lived in two different apartments. They were living in a five-bedroom house where each girl would have her own room. Grandparents argue that insufficient time has passed to determine if Mother is truly stable. We agree that in some circumstances the district court is well advised to wait before returning custody to a mother who merely asserts that she has reformed. Now, however, another year has passed. Mother has not requested that the children be returned to her immediately. She recognizes the district court's

authority to hold a new hearing to determine if she is currently a fit parent. At such a hearing, Grandparents may present any new evidence relevant to the question of Mother's current fitness. Grandparents are bound, however, by the trial court's rulings that have not been disturbed by this opinion and by our holdings that they failed to present sufficient evidence in the initial hearing to justify a finding that Mother was unfit and that Mother's voluntary relinquishment of physical custody does not constitute extraordinary circumstances. *See Hoffman v. Hoffman,* 228 Kan. 290, 613 P.2d 1356, 1358 (1980) ("[A] decree awarding child custody is res judicata with respect to the facts existing at the time of the decree. . . . However, when facts and circumstances change, custody may be changed.") (internal citation and quotation marks omitted).

{34} Nonetheless, we share Grandparents' concern about the girls' attachment to Grandparents as parental figures and about the emotional difficulty that will result from a transfer of custody. On remand, if Mother is established to be a fit parent and the district court is satisfied that the children will be able to make the transition to Mother's custody without suffering permanent psychological damage, the district court should consider the most appropriate way to transition custody from Grandparents to Mother. As our Supreme Court observed in *J.J.B.,* a child should not be awarded "like a trophy to whichever party wins the litigation." 119 N.M. at 654, 894 P.2d at 1010. In child custody matters, even when the court must protect the rights of the parent, the court has equitable power to fashion a remedy that protects the best interest of the children as well. *See In re Adoption of Francisco A.,* 116 N.M. 708, 713–14, 866 P.2d 1175, 1180–81 (Ct.App.1993). Given the girls' level of attachment to Grandparents, continued contact with Grandparents seems essential. If necessary, a gradual transition should be considered. During the two evidentiary hearings on this matter, the district court did not have the benefit of any expert testimony. If financially feasible, expert advice might help the court devise a transition plan that will ease the children's apprehension. In addition if possible, counseling might help Mother and Grandparents rees-

tablish an amicable relationship so that the girls do not feel they are caught in the middle of a family war.

{35} On the other hand, we are also concerned about the continuing infringement on Mother's fundamental rights. If, in this case, the children's court attorney had filed a neglect petition, the court would have been required to hold an initial custody hearing within ten days and an adjudicatory hearing with 60 days. *See* § 32A–4–18(A); NMSA 1978, § 32A–4–19(A) (1997). In this case, the court's ultimate disposition was rendered fourteen months after Grandparents filed their petition, during which time the children became more and more accustomed to living with Grandparents instead of Mother, and now another year has passed. While we cannot mandate a specific time frame for the hearing upon remand, we hope the district court will act expeditiously in order to protect Mother's due process rights, and will recognize Mother's predominate right to custody while determining how custody should be transferred to Mother, unless there is evidence to overcome this presumption.

## CONCLUSION

{36} The district court had no authority under the Probate Code to appoint guardians for Ashleigh and Stefanee, and it erred when it denied Mother custody without an express finding that Mother was unfit or that there were extraordinary circumstances that would make the transfer of custody to Mother detrimental to the children. Therefore, the judgment of the district court is reversed and remanded for further proceedings. On remand, the district court should hold a new hearing to determine if there is current evidence that Mother is unfit or whether such extraordinary circumstances currently exist. If not, the district court should use its equitable powers to transition custody to Mother in a way that is least detrimental to the children.

{37} **IT IS SO ORDERED.**

WE CONCUR: CELIA FOY CASTILLO and IRA ROBINSON, Judges.