IN THE MATTER OF THE GUARDIANSHIP OF THE PERSON AND ESTATE OF D.R.G.

DWIGHT G., APPELLANT, *v.* CONNIE E. P., RESPONDENT.

No. 38575

February 12, 2003                    62 P.3d 1127

*Mark A. Jenkin,* Henderson, for Appellant.

*Gifford, Vernon & Barker* and *Christine A. Washburn,* Las Vegas, for Respondent.

Before SHEARING, LEAVITT and BECKER, JJ.

# OPINION

*Per Curiam:*

This is an appeal from a district court order appointing respondent Connie E. P. as general guardian of D.R.G., a minor child. Connie is the child's maternal aunt. Appellant Dwight G., the child's natural father, appeals arguing that the district court erred by failing to observe the parental preference of NRS 159.061 and that there was no clear evidence in the record to support a finding that it was in the child's best interest to award guardianship to Connie. We disagree. The district court did not abuse its discretion in granting guardianship to Connie. We also agree with the district court that if Dwight is able to show that he has created a loving bond with the child, that he has taken parenting classes and undergone reunification therapy, that he has undergone tolerance training or anger control management therapy, and that he has learned to manage the child's health care needs, the issue of guardianship can be revisited.

## FACTS

D.R.G. was born on October 25, 1991, in Southern California, to Donna G. and Dwight G., who were once married but were divorced long before the child was born. The child's birth certificate lists Dwight as the father. Although paternity, custody, visitation, and child support were never judicially determined, Donna exercised sole physical custody of the child and Dwight voluntarily paid her $300 per month in child support. For nearly two years after the child's birth, Donna lived in the same vicinity as Dwight in Southern California.

At seven months of age, the child was diagnosed with cystic fibrosis, and later with cerebral palsy. The child requires daily, time-consuming chronic therapies.

On September 1, 1993, Donna, her sister Connie, the child, and the child's older sister moved to Las Vegas. From that time to the present, the child has lived primarily with Connie, although the child also spent a significant amount of time with Donna. Connie has participated, along with Donna, in the child's care since birth. Whenever the child had to stay in the hospital overnight, Connie would also stay at the hospital. It was Connie who took the child to weekly physical therapy. It was Connie who took the child to school every day to accommodate Donna's work schedule.

Dwight claims that until 1999, he made regular visits to Las Vegas to visit the child and the child's sister. Donna asserted in her affidavit, however, that Dwight had never indicated or shown any interest in providing a home for the child or in having a regular visitation schedule.

Three years before the guardianship hearings, Donna was diagnosed with terminal cancer. After that, Dwight admits that his visits became less frequent. Dwight claims he saw the child twelve times in 1999, about six times in 2000, and only once during the first half of 2001. In addition, Dwight did not call the child by telephone at all during the six months prior to the guardianship hearings.

Dwight admits that he has never gone to any of the child's medical appointments. However, he claims he went to several of the child's therapies during the first two years of the child's life when Donna and the child still lived in California. Dwight has never spoken to any of the child's medical care providers in Las Vegas. Dwight has never stayed all night in the hospital with the child. Dwight does not even know how many times the child has been in the hospital. Dwight has admittedly referred to the child in such derogatory terms as "Cripple" and "Sausage Arm," due to the child's physical malady. According to Dwight, the longest visit the child ever had with him in California was three days. After one such visit, however, the child returned to Las Vegas with over half

of the required medicines untaken. When questioned during the hearings, Dwight did not even know the child's birth date.

Dwight admits that he has a past history of violence, including a battery charge in 1964 and another such charge in 1974. Dwight also admits that he hit Donna's brother, Lee, over the head with a baseball bat in 1985. No charges were brought in that incident because Dwight paid Lee $1,000. Dwight also acknowledges that he hit Donna during their marriage, but claims there were no further incidents of violence after their divorce. Donna, however, claims that Dwight attacked her while she was pregnant with the child, causing her multiple head and facial injuries.

During the final stages of Donna's cancer, on April 17, 2001, Connie petitioned the district court, seeking guardianship of the child. Donna provided an affidavit, stating her desire that Connie be granted sole legal custody of the child in the event of her death. Donna's affidavit also stated that "[the child]'s health and welfare would be in very real danger if [the child] were placed under Dwight's care for any extended period of time." An evidentiary hearing was set for May 18, 2001. On April 27, 2001, the court issued an order appointing Connie as temporary guardian of the child.

The evidentiary hearing took place on May 18, 2001, and was continued to June 15, 2001, for completion. During this interval, Donna died. Because the temporary guardianship had expired and Donna was now deceased, the district court issued an order granting Connie an emergency general guardianship on June 5, 2001. The order provided that the guardianship would be reviewed on June 15, the date of the continued hearing.

At the May 2001 hearing, Dr. Ruben Diaz, the child's attending physician, testified concerning the serious nature of cystic fibrosis, which is a terminal disease. He stated that the child is in the mild range of the disease at this time, due mostly to the excellent care and therapies the child has received. Dr. Diaz further testified that continuity of care was extremely important.

During the June 2001 evidentiary hearing, the child was interviewed at the family mediation center, at the court's request. After the interview, the family mediation center specialist was sworn in so he could testify regarding the child's wishes. The family mediation center specialist testified that the child indicated a preference to live with Connie rather than with Dwight. The child stated that the most important people in the child's life were Donna and Connie. The child expressed a desire to live with Connie and just visit Dwight. When asked why, the child expressed a belief that Connie loves the child more and the child was happier there.

Following the second hearing, the guardianship commissioner filed a report and recommendations. The guardianship commissioner recommended that Connie continue as general guardian of the child, based on a finding that the child's unique circumstances

and best interests so required. The guardianship commissioner further provided that Dwight could come back to the court to revise the guardianship provided he ''make a showing that he has created a loving bond with [the child], that he has taken parenting classes and undergone reunification therapy, that he has undergone tolerance training or some type of anger control management therapy, and that he has learned to manage [the child's] health care needs.'' The guardianship commissioner's recommendations were adopted by court order.

Dwight filed this appeal, alleging that the trial court erred by failing to observe the parental preference under NRS 159.061. Dwight further asserts that the guardianship commissioner erred by utilizing a best interests of the child test rather than observing parental preference as set forth in NRS 159.061. Finally, Dwight claims that there was no clear evidence in the record sufficient to support a finding that it was in the child's best interests that Connie be awarded guardianship.

## DISCUSSION

''The district court enjoys broad discretionary powers in determining questions of child custody.''[1] This court will not disturb the district court's exercise of discretion unless the discretion is abused.[2] ''However, this court must be satisfied that the district court's decision was based upon appropriate reasons.''[3]

To aid the court in making guardianship decisions, the Nevada Legislature has established guidelines in NRS 159.061. NRS 159.061(1) provides, in part, that ''[t]he parents of a minor, or either parent, if qualified and suitable, are preferred over all others for appointment as guardian for the minor.'' Parental preference, provided in NRS 159.061(1), is a presumption that must be overcome before a court can grant guardianship to a non-parent.[4]

Before the parental preference is applied, the court must first determine if a parent is ''qualified and suitable.''[5] Qualification and suitability are based on the parent's fitness for guardianship at the time of the hearing.[6] If a parent is qualified and suitable, the par-

---

[1]*See Locklin v. Duka,* 112 Nev. 1489, 1493, 929 P.2d 930, 933 (1996).

[2]*Id.*

[3]*Id.*

[4]*See Litz v. Bennum,* 111 Nev. 35, 38, 888 P.2d 438, 440 (1995).

[5]NRS 159.061(1).

[6]*See In re Byran,* 48 Nev. 352, 356, 232 P. 776, 777 (1925) (citing *In re Green,* 221 P. 903 (Cal. 1923)).

ent prevails over non-parents for guardianship of the child.[7] If, however, neither parent is qualified and suitable, or if both parents are, the statute requires the court to move to the second step, determination of who is most suitable.[8] NRS 159.061(1) provides that one of the factors in determining a parent's suitability is whether the parent can provide for the basic needs of the child, including medical care.[9] Thus, the child's basic needs or welfare are superior to the claim of a parent.[10] Further, the parental preference can be rebutted by showing parental unfitness or other extraordinary circumstances.[11] In *Locklin v. Duka*,[12] we held that extraordinary circumstances are those that result in serious detriment to the child. Relevant factors to be considered include:

> abandonment or persistent neglect of the child by the parent; likelihood of serious physical or emotional harm to the child if placed in the parent's custody; extended, unjustifiable absence of parental custody; continuing neglect or abdication of parental responsibilities; provision of the child's physical, emotional and other needs by persons other than the parent over a significant period of time; the existence of a bonded relationship between the child and the non-parent custodian sufficient to cause significant emotional harm to the child in the event of a change in custody; the age of the child during the period when his or her care is provided by a non-parent; the child's well-being has been substantially enhanced under the care of the non-parent; the extent of the parent's delay in seeking to acquire custody of the child; the demonstrated quality of the parent's commitment to raising the child; the likely degree of stability and security in the child's future with the parent; the extent to which the child's right to an education would be impaired while in the custody of the parent; and any other circumstances that would substantially and adversely impact the welfare of the child.[13]

Here, the guardianship commissioner specifically found that this case involved "unique circumstances." Managing the child's cystic fibrosis and cerebral palsy is of the utmost importance to the child's well being. Dr. Ruben Diaz, the child's treating physician, testified that cystic fibrosis is a terminal disease and that failure to

---

[7]*See* NRS 159.061(1).

[8]*See* NRS 159.061(2).

[9]*See* NRS 159.061(1)(b).

[10]*See Fisher v. Fisher,* 99 Nev. 762, 765, 670 P.2d 572, 573 (1983).

[11]*See Litz,* 111 Nev. at 38, 888 P.2d at 440.

[12]112 Nev. at 1495-96, 929 P.2d at 934.

[13]*Id.* at 1496, 929 P.2d at 934-35.

strictly follow treatment and medication regimens can result in serious detrimental effects. In addition, Dr. Diaz emphasized that continuity of care is an important factor in determining the success of treatments.

At the time of the hearings, Dwight had not shown that he was sufficiently involved and educated regarding the treatment protocol that the child's health required. The evidence at the hearings showed that Dwight had not given the child all of the required medications on more than one occasion when the child was with him. Additionally, in the seven years that the child had lived in Las Vegas, Dwight had never been to any of the child's medical appointments. Without a demonstration that Dwight could adequately care for the child, the district court could not grant custody to Dwight without potentially undermining the child's physical welfare.

In contrast, Connie has been involved in the child's medical care from the time the child was first diagnosed. Every time the child spent the night in the hospital, Connie was there or accompanied the child. Additionally, Connie routinely took the child to the weekly physical therapy appointments. Dr. Diaz testified that under Connie's care, the child had done ''quite nicely.''

Another extraordinary circumstance in this case is the recent death of the child's mother, Donna. As the child expressed to the family mediation center specialist, besides Donna, the other most important person in the child's life is Connie. The child has primarily lived with Connie from the age of two. She took the child to school and to medical appointments. She has always been active in the child's care from the time of birth. The child has a bonded relationship with Connie.

In contrast, Dwight has spent little time with the child, especially in recent years. At the time of the hearings, the child had never visited Dwight for more than a few days. In the six months before the hearings, Dwight had only visited the child on one occasion. In the year prior to that, there were only about six visits. To give custody to Dwight, without first creating a more significant bond, could seriously jeopardize the child's emotional welfare.

Therefore, even though Dwight is not unfit, he was not qualified and suitable to be the child's guardian at the time of the guardianship hearing due to extraordinary circumstances. The child's welfare takes precedence over Dwight's parental rights. The parental presumption of NRS 159.061(1) was properly rebutted.

Under NRS 159.061, once the parental preference is overcome, guardianship should go to ''the qualified person who is most suitable and is willing to serve.''[14] NRS 159.061(3) provides factors to

---

[14]NRS 159.061(2).

aid the court in determining who is most suitable. One relevant factor is a parent's nomination of a guardian in a will or other written instrument.[15] We have previously stated that such a request is entitled to great weight and will prevail if there are no good reasons to the contrary.[16]

This factor supports the appointment of Connie as guardian. In this case, Donna's will stated that she did not want Dwight to be the child's guardian. In addition, she stated in an affidavit that the child's health and welfare would be in very real danger if the child were placed under Dwight's care for any extended period of time. The affidavit further expressed Donna's desire that her sister, Connie, be granted sole legal custody of the child in the event of her death.

To determine the most suitable guardian, recommendations made by a guardianship commissioner should also be considered.[17] In this case, after a two-day hearing, a guardianship commissioner recommended that Connie continue as general guardian of the child for the time being. The recommendation made clear, however, that if Dwight took significant steps to be reunified with the child, the guardianship could be revisited.

Finally, once the parental-preference presumption has been overcome, the paramount consideration is the child's best interests.[18] The guardianship commissioner found that it was in the child's best interests to maintain Connie's guardianship until such time as Dwight made significant steps toward reunification. The recommendation was adopted by court order. "The weight and credibility to be given trial testimony is solely the province of the trier of fact, and a district court's findings of fact will not be set aside unless clearly erroneous."[19] Here, the guardianship commissioner made findings, based on the evidence presented at the hearings. These findings are supported by the evidence in the record.

We have previously stated " 'that the best interest of the child is usually served by awarding his custody to a fit parent.' "[20] This, however, is an unusual case. We agree with the district court when

---

[15]NRS 159.061(3)(b).

[16]*See Badenhoof v. Johnson,* 11 Nev. 87, 88 (1876).

[17]NRS 159.061(3)(e).

[18]*See Hesse v. Ashurst,* 86 Nev. 326, 331-32, 468 P.2d 343, 346 (1970).

[19]*Locklin,* 112 Nev. at 1497, 929 P.2d at 935 (citing *Washington v. State,* 96 Nev. 305, 308, 608 P.2d 1101, 1103 (1980)).

[20]*Litz,* 111 Nev. at 38, 888 P.2d at 440 (quoting *McGlone v. McGlone,* 86 Nev. 14, 17, 464 P.2d 27, 29 (1970)).

it emphasized that Dwight can become qualified and suitable. Once this is accomplished, guardianship for the child can be revisited. The report and recommendations adopted by the court state:

> [T]he guardianship may be revisited upon a showing by [Dwight] that he has taken significant steps to be reunified with [the child], namely that [Dwight] has created a loving bond with [the child], that he has taken parenting classes and undergone reunification therapy, that he has undergone tolerance training or some type of anger control management therapy, and that he has learned to manage [the child]'s health care needs.

In conclusion, the district court did not abuse its discretion when it ordered that, for the present time, Connie should be the child's guardian. The provisions of NRS 159.061 were properly addressed. Accordingly, we affirm the judgment of the district court.