# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2013-CT-01244-SCT

## CONSOLIDATED WITH

## NO. 2012-CT-00196-SCT

*JAMES WILSON*

*v.*

*PEARLEAN DAVIS*

## ON WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 07/01/2013 |
| TRIAL JUDGE: | HON. PATRICIA D. WISE |
| TRIAL COURT ATTORNEYS: | FELECIA PERKINS |
| | JESSICA NICOLE AYERS |
| | JOHN R. REEVES |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | FELECIA PERKINS |
| | JESSICA NICOLE AYERS |
| ATTORNEYS FOR APPELLEE: | JOHN R. REEVES |
| | JOHN JUSTIN KING |
| NATURE OF THE CASE: | CIVIL - CUSTODY |
| DISPOSITION: | THE JUDGMENT OF THE COURT OF APPEALS IS AFFIRMED IN PART AND REVERSED IN PART. THE JUDGMENT OF THE CHANCERY COURT OF HINDS COUNTY IS REVERSED, AND THE CASE IS REMANDED - 01/07/2016 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

EN BANC.

KING, JUSTICE, FOR THE COURT:

¶1.     In this custody action between a child's natural father and her maternal grandmother,

the chancery court found that the natural parent presumption was rebutted, and, further, that

the best interests of the child were served by remaining in the physical custody of the

grandmother, while allowing the father liberal visitation.  Because the evidence was

insufficient to rebut the natural parent presumption, we reverse and remand the case for

further proceedings consistent with this opinion.

## FACTS

¶2.     Sha'Nyla Wilson ("Sha") was born to Concetter Davis and James Wilson on April 20,

2003.  Sha has a maternal half-sister, Ka'Nyla ("Ka"), who is two years older than Sha.

> This action began as a paternity and custody dispute between Concetter
> and James Wilson.  James was adjudged to be Sha's natural father.  Concetter
> was awarded custody, and James was awarded visitation.
>       Concetter died in 2011.  When Concetter's relatives would not return
> Sha to James, he filed a petition for modification and sought sole legal and
> physical custody of Sha.  The chancellor entered an order that awarded the
> primary physical custody of Sha to Pearlean Davis, Sha's maternal
> grandmother.  The chancellor also awarded James liberal visitation.
>       In the decision, the chancellor did not treat the issue as an initial
> custody dispute between a natural parent and grandparent.  Instead, the
> chancellor considered the motion as a modification of child custody based on
> the prior custody determination between Concetter and James.
>       The judgment was appealed and assigned to [the Court of Appeals].
> [The Court of Appeals] reversed the judgment and remanded the case for the
> chancellor to make a determination of whether the natural-parent presumption
> had been rebutted.  *See Wilson v. Davis*, 111 So. 3d 1280, 1283 (¶11) (Miss.
> Ct. App. 2013).

*Wilson v. Davis*, No. 2013-CA-01244-COA, 2014 WL 6436839, at *1 (Miss. Ct. App. Nov.

18, 2014).  Rather than conduct a new hearing regarding the rebuttal of the natural parent

presumption on remand, the chancellor instead simply amended her original order and opinion to find that the natural parent presumption was rebutted.

¶3.     The chancellor first found that James had abandoned Sha, but the Court of Appeals reversed that decision, determining that such a finding was not supported by substantial evidence. *Id.* at *3. The chancellor then found James's conduct to be so immoral as to be a detriment to Sha. The chancellor noted that James had been married three times, had a history of dating much younger women, and had a history of dating multiple women at the same time, including committing adultery. She noted that James was seventy-two at the time of the hearing. The chancellor found that James's current, much-younger wife, Annette Wilson, had two sons who had serious anger issues, as evinced by the fact that they were in therapy for said issues multiple times per week. The chancellor expressed concern that James had a "lack of awareness or lack of concerns of the potential danger" to which Sha "could be" exposed. Further, she found that Annette and Sha had no real bond with one another, and that Annette, a homemaker, would be primarily responsible for Sha's care. Moreover, the chancellor found Annette and Concetter had gotten into a physical altercation in front of Sha. The chancellor further found that, shortly before Concetter died, James had filed papers to have her committed. The court noted that it "is not convinced that it is in his daughter's best interest for Mr. Wilson to have sole custody." It then concluded that James was

> asking this Court to remove the minor child from the home she has known for the better part of life and from her 10 year old sibling, Ka, who she resides with. Sha will also be taken away from her cousins and a very close college age aunt if Mr. Wilson obtains physical custody. In light of the emotional

3

stress she has experienced resulting from the untimely death of her mother and considering all factors outlined above, this Court finds that this environment would be clearly detrimental to the minor child and shows an otherwise unfitness by Mr. Wilson to believe this is a good environment for his daughter.

The chancellor then found that the natural parent presumption had been rebutted because the court was "clearly convinced that Mr. Wilson has shown himself to be otherwise unfit." The chancellor then placed Davis, the grandmother, on equal footing with James and applied an *Albright*[1] analysis. Under that analysis, the chancellor found that the best interests of Sha were served by Davis retaining primary physical custody, Davis and James being granted joint legal custody, and James being granted liberal visitation.

¶4. James appealed and Davis failed to file an appellate brief. The Court of Appeals declined to find that Davis's failure to file a brief was tantamount to a confession of error. A divided Court of Appeals affirmed the chancellor's determination that James's conduct was so immoral that he was unfit to have custody, and that the natural parent presumption was thus rebutted. It also found no error in the chancellor's *Albright* analysis. Judge Roberts dissented in an opinion joined by Judge Irving. Judge Roberts argued that he could not "find that the chancery court's reliance on this evidence [of James's dating and marital relationships] is clear and convincing evidence of immorality and unfitness such that the natural-parent presumption should be overcome." He further argued that the other facts of immorality and unfitness found by the chancellor, such as the anger issues of James's stepsons, were more suited for an *Albright* analysis, and had little bearing on James's morality or fitness as a parent. Judge Roberts last concluded that he could not "reconcile the

---

[1] *Albright v. Albright*, 437 So. 2d 1003 (Miss. 1983).

chancery court's finding that James was so immoral and unfit to parent Sha that the natural-parent presumption was overcome, while at the same time awarding him joint legal custody and liberal visitation." Judge Roberts believed the case should be reversed and judgment rendered granting James custody, while remanding the matter to consider grandparent visitation.

¶5.     James filed a motion for rehearing, which the Court of Appeals denied. He then petitioned this court for certiorari review, which we granted. In his petition, he argued that the Court of Appeals' decision regarding Davis's failure to file a brief being tantamount to a confession of error conflicted with prior precedent, and that the Court of Appeals' decision that the evidence of unfitness and immorality against him established by clear and convincing evidence that the natural parent presumption had been rebutted was error. We limit our review to the issue of whether clear and convincing evidence existed to rebut the natural parent presumption. *See Guice v. State*, 952 So. 2d 129, 133 (Miss. 2007) (Supreme Court "unquestionably" has the authority to limit the issues on review); *see also Yelverton v. Yelverton*, 26 So. 3d 1053, 1056-57 (Miss. 2010) (even if one party fails to file a brief, "in matters of child custody and support . . . this Court will 'make a special effort to review the record for support for affirmance.'" (quoting *Barber v. Barber*, 608 So. 2d 1338, 1340 (Miss. 1992))).

## ANALYSIS

¶6.     This Court reviews the chancellor's findings for manifest error. *Westbrook v. Oglesbee*, 606 So. 2d 1142, 1146 (Miss. 1992).

5

¶7. "The best interest of the child is paramount in any child-custody case." ***Smith v. Smith***, 97 So. 3d 43, 46 (Miss. 2012). Indeed, "[t]his is a principle of law so deeply embedded in our jurisprudence that it should not require further elaboration or citation of authority." ***In re Dissolution of Marriage of Leverock and Hamby***, 23 So. 3d 424, 429 (Miss. 2009). This Court has consistently held that it is presumed that the best interests of a child are served by being in the custody of his or her natural parent, as opposed to a third party. ***Davis v. Vaughn***, 126 So. 3d 33, 37 (Miss. 2013). "[H]uman experience has demonstrated that as a general rule parental love and solicitude for the child's welfare are the best guarantee that it will be properly cared for . . . . The presumption in all cases is that the child's parents will love it most and care for it better than anyone else and it is in the best interest of the child to leave it in the custody of a parent." ***Moody v. Moody***, 211 So. 2d 842 (Miss. 1968). This presumption "may be rebutted by clear and convincing evidence that '(1) the parent has abandoned the child; (2) the parent has deserted the child; (3) the parent's conduct is so immoral as to be detrimental to the child; or (4) the parent is unfit, mentally or otherwise, to have custody.'" ***Davis***, 126 So. 2d at 37 (quoting ***Smith***, 97 So. 3d at 46). If the natural parent presumption is rebutted, "the court may then proceed to determine whether an award of custody to the challenging party will serve the child's best interests." ***Davis***, 126 So. 3d at 37.

¶8. Requiring clear and convincing evidence to rebut the natural parent presumption in one of the four manners listed is important to "honor[] and protect[] the fundamental right of natural parents to rear their children." ***Id.*** However, this Court takes the opportunity to

note that the rigid adherence to proving one of the four precise factors to rebut the natural parent presumption may, in very limited and *exceptional* circumstances, place a child in a circumstance that is clearly not in his or her best interests. And, as is clearly established, the best interests of the child is the lodestar in custody cases. This Court has recognized this principle in the past, stating that "[i]n order to overcome this presumption, there must be a clear showing that the parent is unfit by reason of immoral conduct, abandonment, or *other circumstances which clearly indicate that the best interest of the child will be served in the custody of another*." **Moody**, 211 So. 2d at 844 (emphasis added). With this decision, we mark a return to that principle. The natural parent presumption may be rebutted by clear and convincing evidence that actual or probable, serious physical or psychological harm or detriment will occur to the child if custody is placed with the natural parent, such that granting custody to the third party is substantially necessary to prevent such probable harm.[2]

---

[2]Examples of courts finding that exceptional circumstances exist often involve children with special medical and/or developmental needs. For example, in ***In re Marriage of Allen***, the child, who was deaf, lived with his mother; then, after his father obtained custody, the father left the child with his maternal grandmother. ***In re Marriage of Allen***, 626 P.2d 16, 18 (Wash. Ct. App. 1981). When the father remarried, the child, then three years old, moved in with his father and stepmother. *Id.* at 18-19. During the four years that the father and stepmother were married, the stepmother worked with the child to teach him sign language, she found special training for the child (who was also behind in his intellectual development), she herself took special classes and provided additional training and tutoring to the child, and she went into debt to help pay for the child's education and special tools. *Id.* at 19. The court noted that the results of her efforts were dramatic. *Id.* At the time of the trial, the child's intellectual development was at the level of that of hearing children his age, which "various witnesses indicated this was remarkable for a deaf child." *Id.* The Court found that "[t]he reason for this remarkable development was not only [the child's] native intelligence, but also his education and home environment which was conducive to communication in sign language. [The stepmother] and her three children use sign language as fluently as ordinary speech. All have the habit of 'signing' everything they say in [the child's] presence, so that he participates in the conversations." *Id.*

7

In other words, if demonstrable, clear and convincing evidence exists that the child will

suffer probable harm and detriment in the custody of the natural parent, the court may find

that the natural parent presumption is rebutted, and consequently proceed to a determination

---

Conversely, the father was found to know only minimal sign language, and the court found that his attitude towards his child's future development was "apathetic and fatalistic." *Id.* The court found that these were very unusual circumstances and were subject to change, which might mean a modification of custody was appropriate at a later time, but it ultimately determined that the child's future development would be detrimentally affected by his father having custody. *Id.* at 22-23.

Another example involved a child with cystic fibrosis and cerebral palsy. *In re Guardianship of D.R.G.*, 62 P.3d 1127 (Nev. 2003). The child lived with his mother for the first two years of his life, then moved to Las Vegas with his mother, his aunt, and his sister. *Id.* at 1129. There, he lived primarily with his aunt, but spent significant time with his mother. *Id.* His aunt took him to his weekly physical therapy, spent the night in the hospital with him, and had participated in his care since birth. *Id.* His mother was then diagnosed with terminal cancer. *Id.* At a custody trial between the aunt and the father, the child's doctor testified that "[m]anaging the child's cystic fibrosis and cerebral palsy is of the utmost importance to the child's well being. . . .[C]ystic fibrosis is a terminal disease and . . . failure to strictly follow treatment and medication regimens can result in serious detrimental effects." *Id.* at 1131. Furthermore, he "emphasized that continuity of care is an important factor in determining the success of treatments" and that "the child is in the mild range of the disease at this time, due mostly to the excellent care and therapies the child has received." *Id.* at 1130-31. The court also found that the father visited the child only sporadically, that he had "never gone to any of the child's medical appointments[,] . . . never spoken to any of the child's medical care providers in Las Vegas[,] . . . never stayed all night in the hospital with the child[,] . . . [and] does not even know how many times the child has been in the hospital." *Id.* at 1129. Additionally, the father had "admittedly referred to the child in such derogatory terms as 'Cripple' and 'Sausage Arm,' due to the child's physical malady." *Id.* The longest visit the child ever had with his father at his father's home was for three days, and the child returned home with more than half of his required medicines untaken, and such had happened on more than one occasion. *Id.* at 1129, 1131. The father did not even know the child's birth date. *Id.* at 1129. The Court noted that the father had not demonstrated that he could adequately care for the child, and that granting him custody could undermine the child's physical and emotional welfare. *Id.* at 1131. The court found that, while the father was not unfit, he was not qualified to have custody of the child due to extraordinary circumstances. *Id.* at 1132. The court did note that if the father took significant steps to be reunified with his child, it would revisit the custody determination. *Id.*

8

of whether a custody award to the challenging party will be in the child's best interests. Such a finding must prevent probable *harm* to the child, and not simply find that the third party can provide the child with different or arguably "better" things. *See Moody*, 211 So. 2d at 844 ("The fact that someone else may be in a better position to furnish the child a larger and more convenient home in which to live does not necessarily mean it would be in the best interest of the child to take it from a parent who is otherwise fit to have the custody of the child."). This "*exceptional* circumstances" finding means more than that a child's bests interests may be served by third party custody; it "requires proof of serious physical or psychological harm or a substantial likelihood of such harm." *Watkins v. Nelson*, 748 A.2d 558, 565 (N.J. 2000). More than simply best interests is required, because if that "is the only criterion, then a judge may take children from their parents because the judge personally disproves of the parents' limited means." *Id.* at 567 (internal quotations and alterations omitted). By requiring a much higher threshold than simply best interests, the *exceptional* circumstances finding "is designed to reduce or minimize judicial opportunity to engage in social engineering in custody cases involving third parties." *Id.* It is important not to devolve into a less stringent standard because such would easily "evolve into a 'fitness contest' whose outcome will depend on the whims of the trial court." *Id.* at 568. "The standard that we adopt has as its benchmark the welfare of the child while at the same time protecting parental rights." *Id.*

¶9.     If the court finds that custody should be granted to the third party under this standard, it is *required* to make very specific findings of fact on the record. We again emphasize that this is a high threshold. However, we believe this standard will allow chancery courts to

9

reconcile the fundamental rights of natural parents to raise their own children with the

primary concern in a custody case, the best interests of the child.[3] *See Davis*, 126 So. 3d at

---

[3]Many other states also have standards that allow for slightly more flexibility in determining whether a child should be placed with a third party instead of a natural parent. *See, e.g.*, *Watkins v. Nelson*, 748 A.2d 558, 559, 564 (N.J. 2000) (The natural parent presumption "can be rebutted by proof of gross misconduct, abandonment, unfitness, or the existence of 'exceptional circumstances[.]'" The parental presumption is rebuttable because the right to custody "must, at times, give way to the State's *parens patriae* obligation to ensure that children will be properly protected from serious physical or psychological harm." Thus, "[t]he 'exceptional circumstances' exception may rebut the presumption in favor of a parent seeking custody even if he or she is deemed to be a fit parent" because of the Court's power to protect minor children from serious physical or psychological harm. "Exceptional circumstances" mean more than simply the child's best interests; rather, it "always requires proof of serious physical or psychological harm or a substantial likelihood of such harm."); *Adams v. Tessener*, 550 S.E.2d 499 (N.C. 2001) (natural parent presumption is rebutted only upon a showing by clear and convincing evidence of unfitness or "where the parent's conduct is inconsistent with his or her constitutionally protected status"); *In re Marriage of Dafoe*, 754 N.E.2d 419 (Ill. App. Ct. 2001) ("[I]n order to retain custody of a child over the superior right of the natural parent, a third party must demonstrate good cause or reason to overcome the presumption that a parent has a superior right to custody[.]"); *Clark v. Wade*, 544 S.E.2d 99 (Ga. 2001) (In order to rebut the natural parent presumption, the third party must "show that parental custody would harm the child." "By harm, we mean either physical harm or significant, long-term emotional harm; we do not mean merely social or economic disadvantages."); *Charles v. Stehlik*, 744 A.2d 1255 (Pa. 2000) (natural parent presumption is rebutted only if "convincing reasons" appear that the child's best interest will be served by awarding custody to the third party); *In re Guardianship of J.S.L.F.*, 826 N.W.2d 916 (N.D. 2013) (a court may place a child in the custody of a third party instead of a parent when exceptional circumstances exist and it is in the best interests of the child to be placed with the third party); *In re Guardianship of Ashleigh R.*, 55 P.3d 984 (N.M. Ct. App. 2002) (An otherwise fit parent can be denied custody upon a finding that extraordinary circumstances justify the decision. "A finding of extraordinary circumstances must be based on proof of a substantial likelihood of serious physical or psychological harm, . . . or serious detriment to the child[.]" Psychological harm must not be presumed by the circumstances, but the third party must prove that the child "would suffer substantial, long-term psychological harm if custody was transferred to" the natural parent.); *In re Guardianship of D.R.G.*, 62 P.3d 1127 (Nev. 2003) (Unfitness or other extraordinary circumstances, which are circumstances that result in serious detriment to the child, may rebut the natural parent presumption. A list of several factors may be considered to determine whether extraordinary circumstances exist, among them the likelihood of serious physical or emotional harm to the child and any other circumstances

38 ("Judges often are faced with the difficult task of removing a child from a loving home in deference to a natural parent's custodial rights. Even so, the law does not allow parental rights to supercede [sic] the best interests of the child.").

¶10.   Turning to this case, we find that the chancellor erred for several reasons. The original hearing, conducted in the vein of a modification of custody, was held in January 2012. In April 2013, the Court of Appeals reversed the chancery court, finding that it had applied the incorrect standard and had not determined whether the natural parent presumption was rebutted. In July 2013, after a year and a half had passed with a great potential for changed circumstances, and without holding a hearing in which both parties were on notice of the issue of rebutting the natural parent presumption, the chancery court simply amended its original order. The chancery court should have held a hearing and received and

---

that would substantially and adversely impact the child's welfare.); ***Florio v. Clark***, 674 S.E.2d 845 (Va. 2009) (The natural parent presumption may be rebutted with clear and convincing evidence of unfitness, an order of divestiture, voluntary relinquishment, abandonment, or special facts and circumstances constituting an extraordinary reason for taking child from its natural parent.).

considered evidence regarding whether the natural parent presumption was rebutted.[4] *See*

*Yelverton*, 26 So. 3d at 1055, 1057.

¶11.    Furthermore, the evidence found by the chancellor was clearly insufficient to rebut

the natural parent presumption.  First, the court relied on evidence that James dates and

marries women much younger than himself, and that these relationships overlap and include

adultery.  This Court has noted that marital fault, including adultery, may not be used as a

sanction in custody awards.  ***Brekeen v. Brekeen***, 880 So. 2d 280, 287 (Miss. 2004).  While

this is not a divorce action, if adultery may not be sanctioned by denial of custody in a

divorce action, it certainly follows that such behavior will be difficult to justify as sufficient

to rebut the natural parent presumption.  While some of James's relationship behavior may

cause concern, no evidence whatsover was adduced that such behavior has had any actual

detrimental effect on Sha, thus the evidence does not show that James's conduct "is so

immoral as to be *detrimental* to the child." *See **Davis***, 126 So. 3d at 37 (emphasis added).

Additionally, James married his current wife before Concetter passed away and was still

married and living with her at the time of the hearing.  Indeed, the last extramarital affair and

---

[4]The record does raise some areas of concern with James's potential custody of Sha, yet these issues do not appear to have been examined with any thoroughness.  For example, the record indicates that Sha has asthma and that people may smoke at her father's home.  The record further indicates that she has become physically ill from the smoke.  The record is also clear that Concetter, Sha's mother, had severe asthma which led to hospital and ICU stays and, eventually, her untimely death.  Certainly, a failure to cease smoking around Sha, if such is actually occurring, could be of grave concern.  The record also indicates that Sha may have certain unusual allergies or sensitivities which may not be properly addressed at her father's home.  However, on both of these issues, no medical evidence was introduced, no substantial testimony was adduced, and the issues were generally not examined with any specificity.  Such issues could be properly addressed at a hearing in which further evidence is received and considered.

relationship with a younger woman noted by the chancellor were with James's current wife, and began in approximately 2009, more than two years prior to the hearing. The chancellor made no findings that James was currently engaged in adulterous or immoral relationships, and moreover, made no findings that he was involved in any extramarital relationships that harmed or influenced Sha in any way. *See **Westbrook v. Oglesbee***, 606 So. 2d 1142 (Miss. 1992) (where father and his wife drank alcohol, father used to take drugs but had passed random drug tests by his employer for the past six years, a paternal relative smoked marijuana in front of the child once, and father only had minimal contact with child prior to mother's death, the Court found "a stronger case must be made against [the father] and matters of more current nature need to be shown to establish that he is unfit as a parent.").

¶12. The chancellor also cited animosity between Concetter and Annette and James, including physical altercations, as reason to deny James custody. While certainly noteworthy, as it appears in the best interests of Sha to have her mother's memory and her grief for her mother honored, Concetter has passed away, and there is thus no present danger of such animosity or confrontations. These facts are not sufficient to rebut the natural parent presumption, as they do not bear on James's fitness or detrimental immorality, but they may be a consideration in a best interests analysis.

¶13. The chancellor also cited the anger issues of Annette's two sons as a reason to rebut the natural parent presumption. Again, such issues are certainly of concern. Yet, the

evidence indicated that neither Sha[5] nor her stepsister[6] had been injured or harmed by the boys. The evidence also showed that the parents were seeking intensive therapy to address the issues. Anger issues in the home of a natural parent that pose a potential danger to a child are certainly something a chancellor should examine in detail. However, in this case, the determination of harm was not based on any proof of actual or probable harm to Sha, but rather, based upon pure speculation on the part of the court. Thus, this is not an appropriate reason to find James unfit or so immoral as to rebut the natural parent presumption.

¶14. Because none of the facts found by the chancery court are sufficient to rebut the natural parent presumption, we must reverse the chancery court on this issue.

## CONCLUSION

¶15. While the chancery court examined certain facts regarding James's potential custody of Sha that certainly give cause for concern, none of these issues rose to the level of immorality that is detrimental to the child or unfitness; thus the natural parent presumption was not rebutted. We therefore reverse the chancery court's custody determination and remand for further proceedings. Further proceedings should include a hearing in which the court receives and considers evidence concerning whether the natural parent presumption has been rebutted, including whether it is rebutted by exceptional circumstances in which actual or probable, serious physical or psychological harm or detriment will occur to the child. The

---

[5]Sha had regular, overnight visitation in the home with the two boys present, and no harm, or threat thereof, appears to have befallen her.

[6]The boys do not appear to have harmed their younger sister, Sha's stepsister, who lives in the home with them.

14

last hearing in this case was nearly four years ago. Thus, on remand, the chancellor should consider the circumstances at the time of the remand hearing. *See Vaughn v. Davis*, 36 So. 3d 1261, 1267 (Miss. 2010).

**¶16.   THE JUDGMENT OF THE COURT OF APPEALS IS AFFIRMED IN PART AND REVERSED IN PART. THE JUDGMENT OF THE CHANCERY COURT OF HINDS COUNTY IS REVERSED, AND THE CASE IS REMANDED.**

**WALLER, C.J., LAMAR, KITCHENS, PIERCE AND COLEMAN, JJ., CONCUR. RANDOLPH, P.J., CONCURS IN PART AND IN RESULT WITHOUT SEPARATE WRITTEN OPINION. DICKINSON, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION. MAXWELL, J., NOT PARTICIPATING.**

**DICKINSON, PRESIDING JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶17.   The majority's decision to remand this case for a hearing is appropriate. But the only reason that, pending the outcome of that hearing, the child, Sha'Nyla Wilson, remains with her grandmother is that—with no legal right to do so—she refused to turn the child over to her natural father. The natural-parent presumption has not been overcome, and this Court should not aid a third party who, with no legal right to do so, holds a child away from her natural parent. While the particular facts of this case may lead some to the personal view that Sha'Nyla would be "better off" with her grandmother and half-sibling while this case drags on, the precedent set today is remarkable and unsettling.

¶18.   The law *presumes* that it is in Sha'Nyla's best interest to be in the custody of her father.[7] And assuming this Court intends to maintain some semblance of stability, this long-

_____

[7] *See Bullard v. Welch*, 158 So. 791 (Miss. Div. A. 1935); *Sinquefield v. Valentine*, 132 So. 81 (Miss. Div. B 1931); *Nickle v. Burnett*, 84 So. 138 (Miss. 1920); *Rawlings v. Rawlings*, 83 So. 146 (Miss. 1919)**;** *Hibbette v. Baines*, 78 Miss. 695 (1900).

recognized presumption applies no less to this Court than to the trial courts and litigants who come before them. So, had the majority began its analysis (as it should have) with the presumption that it was in Sha'Nyla's best interest to be in the custody of her father, why is the majority leaving her with a third party?

¶19. We, too, should respect and follow the law. But as of today, even though this Court has determined that the natural-parent presumption has not been overcome, the majority aids the grandmother in continuing to hold the child away from her natural father, who has been deprived of having his child for four years while this matter has crept through—and will continue to creep through—the courts. This ad hoc approach to deciding cases based on personal views of the facts rather than an impartial application of the law, is wrong.

¶20. I would presume—as the law requires me to do—that it is in Sha'Nyla's best interest to be in the custody of her father. I would order that she immediately be transferred to her father's custody, and that she remain in his custody unless and until the natural-parent presumption is overcome.