GRIFFIS, P. J.,
FOR THE COURT:
¶ 1. The Jones County Chancery Court terminated the parental rights of the natural mother and adjudicated custody of the minor child between the natural father and the maternal grandparents. The natural father was awarded custody. The maternal grandparents appeal.
FACTS
¶ 2. At a young age, Tiffany Kay Brown was diagnosed with bipolar disorder and a learning disability. She was placed into the special-education program in elementary school. Tiffany was alleged to have behavioral problems and to be easily influenced by others. When she was fifteen years old her behavior became too rebellious for her mother and stepfather, Linda Kaye and Jerry Ruben Sumrall. In 2006, Tiffany was sent to live with a relative. She moved from her parents’ home in Sandersville to Carthage, where she resided with her paternal aunt and her aunt’s live-in boyfriend, Timothy Jerrels. The living arrangement only lasted a short time. Tiffany returned to her home in Sanders-ville after she alleged that Timothy had displayed sexually inappropriate behavior toward her.
¶ 3. Tiffany remained in Sandersville until 2008, when she returned to Carthage to live with her biological father. At the age of seventeen, she dropped out of high school. While living in her father’s home, Tiffany began a sexual relationship with Timothy. The relationship was kept secret. Notably, Timothy is twenty-one years older than Tiffany. Tiffany and Timothy maintained an on-and-off relationship for three years. In 2011, Tiffany became pregnant. While she was in the early stages of her pregnancy, Tiffany moved back to Sandersville to live with her parents.
¶ 4. She remained in the Sumralls’ home until after she gave birth to Trey Brown[1] in August 2012. Throughout the pregnancy and after Trey’s birth, Tiffany refused to divulge the identity of the child’s father. No father was listed on Trey’s birth certificate. When Trey was just a few months old, Tiffany left him with the Sumralls and moved back to Carthage with her aunt and Timothy. Eventually, Tiffany and Timothy moved into a home of their own in Carthage. The Sumralls became the sole caretakers of Trey, and he remained exclusively in their home for the first year of his life.
PROCEDURAL HISTORY
¶ 5. In 2013, the Sumralls filed a petition to adopt Trey. Tiffany formally appeared for the hearing and joined in the action. She signed a waiver of process and consented to the adoption. A summons was issued for the unknown biological father of Trey. Process by publication ran in a Jones County newspaper. The adoption hearing was set for August 14,2013.
¶ 6. On the day of the adoption hearing, Tiffany and Timothy appeared in court together. Timothy declared himself the father of Trey and contested the adoption. DNA test results confirmed that Timothy was Trey’s natural father. The chancellor entered an order joining Timothy to the adoption action, and he appointed a guardian ad litem (GAL). Timothy was also granted supervised visitation with the child. Timothy then filed a petition for custody of Trey on March 17, 2015, and the Sumralls filed a counterclaim for custody on April 21,2015.
¶7. This case was initially pled as a petition for adoption. However, it was ulti *324 mately litigated as a custody action between the Sumralls and Timothy. During the trial, several witnesses and the GAL testified. In his final judgment, the chancellor ruled that Timothy and the Sumralls would share joint legal and physical custody of Trey, until the child reached school age. ,Timothy and the Sumralls,.each received weekly, visitation. .Once Trey reached compulsory school age, the joint-custody arrangement would cease. Timothy would then assume full physical and legal custody of Trey, and. the Sumralls would be awarded visitation every first and third weekend of each month. The Sum-rails appeal the chancellor’s judgment,[2]
STANDARD OF REVIEW
US. “The standard of review in child[-]custody cases is limited.” Floyd v. Floyd, 949 So.2d 26, 28 (¶ 5) (Miss. 2007). “In child-custody cases,, this [C]ourt will only reverse the chancellor’s judgment in two circumstances—(1) [his] factual .'findings are manifestly wrong or clearly erroneous, or, (2) [he] applied an improper legal standard.” Wilson v. Davis, 111 So.3d 1280, 1282 (¶ 7) (Miss. Ct. App. 2013) (citation omitted) (reversed in part on other grounds). “We will examine the case de novo, however, when it is clear that the chancery court’s decision resulted from a misunderstanding of the controlling law or was'based on a'substantially erroneous view of the law.” R.L. v. G.F., 973 So.2d 322, 324 (¶ 5) (Miss. Ct. App. 2008).
ANALYSIS

I. Whether the chancellor erred by omitting a summary of the GAL’s recommendation and the reasons to reject the recommendation.

¶9. The Sumralls first argue that the chancellor abused his discretion by omitting a summary of the GAL’s recommendation and his reasons for rejecting the recommendation. They assert that because this case initially began as a termination-of-parental-rights and adoption case,- and because they raised allegations of abuse or neglect against the natural father, the' appointment of a GAL was mandatory. As such, the Sumralls argue that the chancellor was required to include the summary and give reasons to reject the GAL’s recommendation, because the ruling was allegedly contrary to the recommendation. They assert that the chancellor’s deviation from the GAL’s recommendation that they receive custody of Trey was error. ■
¶10. Timothy contends that the GAL’s initial recommendation, in favor of the Sumralls, was later eliminated at trial. He asserts that the chancellor heard testimony from the GAL and cross-examined her regarding her recommendation. Timothy further contends that the Sumralls’ argument is not factually based on the record. He argues that the GAL’s recommendation changed when she and the chancellor agreed that the parties could share custody of Trey.
¶ 11. Timothy contends that the Sum-rails’ argument is without merit because the GAL’s recommendation and the chancellor’s ruling were ultimately the same. Therefore, he argues there was no requirement that the chancellor explain his reasons for rejecting the recommendation. He further contends that any allegations of abuse or neglect by the Sumralls were unfounded and without merit. He asserts that there was no testimony , of 'improper behavior. Further, he claims that the GAL *325 did not address any allegations related to abuse or neglect when she made her. recommendations. The Sumralls argue that the agreement between the chancellor and the GAL did not relieve the chancellor from his duty to provide the summary and reasons for rejecting the recommendation.
¶ 12. This Court has previously held that “Mississippi law mandates a [GAL] be appointed to protect the interest of -children in termination-of-parental-rights cases.” Farthing v. McGee, 158 So.3d 1223, 1224 (¶ 1) (Miss. Ct. App. 2015) (citing Miss. Code Ann. § 93—16—107) (Rev. 2013)). “[W]hen deciding if termination is proper, chancellors, in their findings of fact, must include' at least, a summary of the GAL’s recommendations.” Id. (citation and internal quotation marks omitted). “Though chancellors are not bound, by a GAL’s recommendations, they must give their reasons when they reject them.” Id. (citation omitted).
¶ 13. The court was initially faced with a termination-of-parental-rights case. However, after Timothy was adjudicated the natural father, the case proceeded as a custody matter between the Sumralls and Timothy. The chancellor appointed a GAL to determine the best interests of the child. Also, the GAL was necessary here because the Sumralls alleged that Trey had been neglected.
¶14. In her report dated January,. 16, 2016, the GAL recommended that Trey remain in the' care and custody of his maternal grandparents. She found that the child was “happy and well-kept” in their home. However, she also determined that Trey seemed “content” in Timothy’s home. Despite finding that Timothy had failed to provide financial support for Trey, the GAL did not recommend that his parental rights be terminated. Instead, she recommended that he receive standard visitation with the child.
¶ 15. On January 20, 2016, just -four days after signing her report, the GAL deviated from her initial recommendation during the following exchange with the chancellor;
[GAL]: [I]n my- opinion it would be in [Trey’s] best interest at this time if [he] remained with-his ■ ' • grandparents because they are who he knows as mom and dad.
THE COURT: He also knows his father, doesn’t he now?
[GAL]:. 'Yes,. judge. .But [Trey] knows the Sumralls, and he knows that is home. So that’s where, he feels safe, Judge. .
THE COURT: ;A11 right.- Let' me ask you another question.
[GAL]: Yes, sir? • -
THE COURT; What if in order to effectuate what the law.presumes to be in the child’s best interest, that to begin with the'Sumhalls and [Timothy] will share custody of [Trey]? So that he would be able to spend more time with his father; yet not ' lose the bond' that he has'with this grandmother and step-grandfa- - ther.
IGÁL]: '. Judge, I don’t have'a problem with that at all. We had suggested it prior, to thé beginning of the trial.
¶ 16. From this exchange, it is'apparent that the GAL agreed, that the. child had come to know his father. Despite the fact that Trey had lived, with his grandparents since birth, neither the.chancellor nor the GAL felt it necessary to continue this arrangement. The chancellor and the GAL agreed, that if would be in Trey’s best interest to have Timofhy and the Sumralls share custody-for a period of time, The GAL and the chancellor agreed on this issue. Therefore, the GAL’s .subsequent *326 recommendation was incorporated into the chancellor’s final judgment.
¶ 17. Since the final judgment reflected both the chancellor’s and the GAL’s recommendations, it cannot be said that the chancellor rejected the recommendation. Nor can we find that the chancellor erred by omitting a summary of the GAL’s initial recommendation. Timothy argues that the GAL’s subsequent recommendation invalidated her previous one. We agree; thus, it was unnecessary for the chancellor to summarize the initial recommendation and provide an explanation for rejecting it in his final judgment.
¶ 18. With regard to the allegations of neglect, the GAL presented no evidence that Timothy had neglected Trey. From the record it is clear that paternity of Trey was not established until after the adoption proceeding began. Both Timothy and Tiffany testified that Timothy only learned that he may be Trey’s father shortly before the adoption hearing.
¶ 19. While Timothy knew that Tiffany had a baby after she left Carthage, there is no evidence that he suspected that he was the child’s father. Tiffany testified that she had engaged in sexual relations with someone other than Timothy around the time that she conceived Trey. Therefore, she was not certain that Timothy was the father, and she chose not to tell him of the possibility. Thus, Timothy’s lack of support was not the result of his neglect.
¶ 20. The Sumralls argue that even after paternity was established, Timothy provided minimal financial support. Indeed, Timothy was employed and could have provided more financial assistance to help with Trey’s care. However, Timothy’s failure to provide child support is not considered to be neglect. After Timothy was adjudicated Trey’s father, Timothy provided for Trey’s needs while Trey was in his home during court-ordered visitation. Also, a petition for child support was pending before the court, but the chancellor had not yet ordered Timothy to pay child support to the Sumralls. Therefore, we find the allegations of neglect due to the failure to provide financial support to be without merit.

II. Whether the chancellor erred by applying a more stringent standard than the legal standard for rebutting the natural-parent presumption.

¶ 21. The Sumralls next argue that the chancellor applied an erroneous legal standard for rebutting the natural-parent presumption. They claim that they alleged abandonment, desertion, and unfitness with specificity in their counterclaim for custody, as grounds for rebutting the natural-parent presumption. They further contend that substantial evidence was offered at trial to support these allegations. But they allege the chancellor, in questioning the GAL, misapprehended the appropriate legal standard when he recited the following:
Would you agree with me that in order to overcome the natural[-]parent presumption under the Mississippi law, the Coux-t m[u]st hear clear and convincing evidence that actual or probable serious, physical or psychological, harm or detriment will occur to the child if [he is] placed with the natural parent?
¶22. The Sumralls contend that this standard was more stringent than the legal standard inquired. They argue that the chancellor made no findings of fact or conclusions of law to negate the application of the erroneous legal standard. Therefore, they argue that the chancellor’s misapprehension of the standard warrants a reversal by this Court.
¶ 23. Timothy argues that the chancellor did not apply an erroneous legal standard. *327 He asserts that the natural-parent presumption had not been rebutted, and, therefore, the chancellor was not required to make specific findings of fact. He argues that a discussion on the four standards used to rebut the natural-parent presumption was unnecessary because the chancellor had no proof of the existence of any of the requirements, as set forth in Wilson v. Davis, 181 So.3d 991, 996 (¶ 8) (Miss. 2016).
¶24. The Mississippi Supreme Court has found that “[t]he law recognizes that parents are the natural guardians of their children, and, it is presumed that it is in the best interest of a child to remain with the natural parent as opposed to a third party.” Davis v. Vaughn, 126 So.3d 33, 37 (¶ 10) (Miss. 2013) (citation and internal quotation marks omitted). “The presumption in all case's is that the child’s [natural] parents will love [him] most and care for [him] better than anyone else ....” Wilson, 181 So.3d at 995 (¶ 7).
However, the presumption in favor of the [natural] parent may be rebutted by clear and convincing evidence that:
(1) the parent has abandoned the child;
(2) the parent has deserted the child;
(3) the parent’s conduct is so immoral as to be detrimental to the child; or
(4) the parent is unfit, mentally or otherwise, to have custody.
Davis, 126 So.3d at 37 (¶ 10) (citation and internal quotation marks omitted). “If the natural-parent presumption is successfully rebutted, the court may then proceed to determine whether an award of custody to the challenging party will serve the child’s best interests.” Id. (citation omitted).
¶ 25. We find that the chancellor applied an improper legal standard. In his exchange with the GAL, the chancellor recited the “exceptional circumstances” standard as set forth in Wilson, 181 So.3d at 995 (¶ 8), rather than the natural-parent presumption. While this standard might apply in custody disputes between a parent and a third party, it is inapplicable to the present matter. In order to overcome the natural-parent presumption, our courts conduct an analysis under the four standards listed above. The “exceptional circumstances” standard is a secondary standard applied only after a court has found that custody should be granted to the third party.
¶ 26. The supreme court in Wilson emphasized that this is high-threshold standard. Id. at 997 (¶ 9). The “exceptional circumstances” standard requires proof that “demonstrable, clear and convincing evidence exists that [a] child will suffer probable harm and detriment in the custody of the natural parent,” in order to “find that, the natural[-]parent presumption is rebutted.” Id. at 996 (¶ 8). This standard clearly requires more proof than the natural-parent-presumption standard.
¶27. Notably, the application of this principle is specific to the facts in Wilson, where the supreme court found exceptional circumstances. The supreme court was inclined to revive this principle[3] after it found “that the rigid adherence to proving *328 one of the four precise factors to rebut the natural[-]parent presumption may, in very limited and exceptional circumstances, place a child in a circumstance that is clearly not in his or her best interests.” Id. at 995 (¶ 8).
¶ 28. Because we find that the chancellor applied an improper legal standard, we apply a de novo standard of review to this issue. The Sumralls argue that the natural-parent presumption was overcome because they alleged abandonment, desertion, and unfitness. After an investigation into the allegations, the GAL made the following findings:
It cannot be stated that [Timothy] has abandoned the minor child due to his court[-]ordered visitation. Nor' can it be claimed that [Timothy] relinquished his rights or is unfit. However, I am of the opinion that the Sumralls and the minor child have become emotionally attached and that it would be quite detrimental to the child if he were removed from their home.
¶29. The GAL’s findings did not overcome the natural-parent presumption. She did not find that Timothy had abandonéd the child. Rather, she noted the continued visitation between Timothy and Trey. There were no findings that Timothy had deserted the child. While the Sumralls contend that Timothy’s character was immoral because he began a relationship with Tiffany when she was a, teenager, the GAL made no findings on this issue. Moreover, both Tiffany and Timothy testified that Tiffany was eighteen years old when they began a sexual ■ relationship. Tiffany further testified that she was twenty-one years -old when she conceived the child. The record contains no evidence to contradict this testimony. Finally, the GAL did not find that Timothy was unfit to receive custody.
¶ 30. Of the four standards required to rebut the natural-parent presumption, none were satisfied. The Sum-rails failed to present clear and convincing evidence that awarding them custody was in Trey’s best interest. “[T]he chancellor must [only] examine, the Albright[4] factors and determine that third-party custody serves the best interest of the child” if the presumption is rebutted. Randallson v. Green, 203 So.3d 1190, 1196 (¶ 25) (Miss. Ct. App. 2016) (citation omitted). Since the presumption was not rebutted, the chancellor was not required to determine whether an award of custody to the Sum-rails was in the child’s best interest.
¶ 31. While we find that the chancellor applied an improper legal standard, we hold. that the error was harmless. The chancellor’s mistake does not warrant reversal. This issue is without merit.

Ill, Whether the chmcellor erred by failing to address evidence of Timothy’s desertion and the Sumralls’ in loco parentis stains.

A. Desertion

¶ 32. In them final assertion of error, the Sumralls contend .that the chancellor overlooked substantial evidence that Timothy deserted Trey. They argue that while Timothy may not have initially confirmed that Trey was his biological child, specific knowledge is not necessary for desertion. They contend that Timothy knew that Tiffany had given birth to a child, and, therefore, he either knew or should have known that he had a child. Thus, they assert he was obligated to support Trey, but he neglected his duty and failed to assert his parental rights.
*329 ¶ 33. The Sumralls further contend that Timothy should have been precluded from objecting to Trey’s adoption because Trey was bom out of wedlock. They argue that Timothy had not demonstrated, within a period of thirty days after Trey’s birth, a commitment to the responsibilities of parenthood. See Miss. Code Ann, § 93-17-5(3)' (Rev. 2013).[5]
¶34. Timothy notes that the Sumralls now argue that he deserted Trey, yet in their original petition for adoption they alleged that the identity and whereabouts of the natural father were unknown. This, Timothy contends, is contradictory. He argues that because he was unaware of the child, he could not have deserted him.
, ¶35. This issue was decided above in issue I.- We see no reason to consider it once again here.

B. In Loco Parentis

¶ 36. The Sumralls also argue that the chancellor disregarded that they stood in loco parentis for the first three and a half years of Trey’s life. They argue that the in loco parentis status, combined with Timothy’s desertion, should have rebutted the natural-parent presumption.
¶ 37. We find that the chancellor did not disregard the care provided by the Sumralís. The chancellor stated, and then confirmed with the GAL, that Timothy had developed a relationship with Trey. The chancellor sought to ensure that both the maternal grandparents and the natural father remain a part of Trey’s life. With regard to the present issue, our supreme court has held that “[although [the] doctrine [of in loco parentis] grants third parties certain parental rights, such rights are inferior to those of a natural parent.” Davis, 126 So.3d at 37 (¶ 12). “Thus, in a custody dispute between one standing in loco parentis and a natural parent, the parent is entitled to custody unless the natural-parent presumption is rebutted.” Id. (citation omitted). Therefore, the chancellor was not required to make a ruling in favor of the Sumralls and ignore Timothy’s status as the natural parent.
¶ 38. We find that the chancellor’s grant of temporary joint custody was based on the best interest of the child. By alternating between the Sumralls’ and Timothy’s homes, Trey would get to know his father and maintain a bond with his grandparents. Although it was ordered that Timothy would retain" full custody of Trey once he reached school age, the Sumralls were awarded visitation on the first and third weekends of each month. We find that the chancellor based his final judgment on Trey’s best interest. This argument is without merit.
¶39. We find no grounds for reversal and affirm the chancery court’s decision.
¶ 40. AFFIRMED.
LEE, C.J., IRVING, P.J., BARNES, CARLTON, FAIR, GREENLEE AND WESTBROOKS, JJ., CONCUR. . WILSON, J„ CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.

. In the interest of privacy, this Court substitutes a fictitious name for the child.

. The Sumralls' notice of appeal is against Tiffany and "the unknown father,” No issues are raised against Tiffany, and she has not filed a brief or otherwise appeared in this appeal. We know “the unknown father”-to be Timothy, • .

. The supreme court noted that this principle had been followed in the past. It referenced the case of Moody v. Moody, 211 So.2d 842 (Miss. 1968), which held that "in order to overcome this presumption, there must be á clear showing that the parent is unfit by reason of immoral conduct, abandonment, or other circumstances which clearly indicate that the best interest of the child will be served in the custody of another.” Wilson, 181 So.3d at 995 (¶ 8) (emphasis added) (quoting Moody, 211 So.2d at 844). The supreme court noted that exceptional circumstances often involve children with special medical and/or developmental needs. Id. at 996 n.2.

. Albright v. Albright, 437 So.2d 1003 (Miss. 1983).

. The version of section 93-17-5(3) that was in effect at the time of these proceedings was amended in 2016, and the referenced provision was deleted. 2016 Miss. Laws ch, 431, § 21 (H.B. 1240),